**GULF OIL TRADING COMPANY, A DIVISION OF GULF OIL CO., Plaintiff-Appellee Cross-Appellant,**

v.

**M/V CARIBE MAR (formerly M/V Fair Sky F), her engines, tackle, apparel, boilers, etc.), Defendant-Appellant Cross-Appellee.**

No. 84–4163.

United States Court of Appeals, Fifth Circuit.

April 19, 1985.

Bryan, Nelson, Allen, Schroeder & Cobb, Harry R. Allen, Gulfport, Miss., Joseph M. Allen, Jr., Gregory C. Buffalow, Mobile, Ala., for defendant-appellant cross-appellee.

White & Morse, George E. Morse, Gulfport, Miss., Burlingham, Underwood & Lord, Robert J. Zapf, New York City, for plaintiff-appellee cross-appellant.

Before GARZA, POLITZ and DAVIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Gulf Oil Trading Company (Gulf) supplied fuel oil to ships owned or chartered by Uiterwyk Corporation (Uiterwyk), a shipping corporation, from 1964 until at least January 11, 1982. This litigation stems from Uiterwyk's insolvency and resulting failure to pay for two deliveries of fuel made toward the end of that commercial relationship. A summary of the facts surrounding these deliveries follows.

I.

In December 1982, Gulf and Uiterwyk made an agreement for the delivery of 380 metric tons of fuel oil (known as "bunkers") to the M/V CARIBE MAR at the port of Houston, Texas. The CARIBE MAR was at that time operating under the terms of a time charter between its owner, Fairplay Caribe, Ltd. (Fairplay) and Uiterwyk. The charter agreement contained a "prohibition of lien" clause: "Charterers [Uiterwyk] will not suffer nor permit to be continued any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the owners in the vessel." The written confirmation with which Gulf responded to Uiterwyk's bunker order, however, contained a provision stating that delivery of the bunkers was subject to Gulf's "International Marine Fuel Oil and/or Marine Lubricants Contract and Price Schedule." Both the Marine Fuel Contract and the Prices Schedule contained a clause stating in essence that Gulf would retain a lien against a vessel for the purchase price of any fuel used by the vessel.[1]

---

1. The clause in the Marine Fuel Oil Contract provides:

> Deliveries of marine fuel oil hereunder are not only on the credit of the buyer but also on the faith and credit of the vessel which uses

Gulf hired National Marine Service, Inc., (National) an independent barging service operating in the Port of Houston, to deliver the bunkers to the CARIBE MAR. On December 4, 1982, the barge carrying the bunkers was brought alongside the CARIBE MAR. At that point the master of the CARIBE MAR hand-delivered to the barge captain on the fuel delivery receipt notice that the vessel was chartered and that the charter contained a prohibition of lien clause. Some dispute then developed over the technical specifications of the bunkers, which was eventually resolved after extended consultations among the master and chief engineer of the CARIBE MAR, representatives of Uiterwyk, and Gulf representatives. The prohibition of lien clause was not brought to the attention of the Gulf personnel during these consultations. Two days following the delivery of the bunkers at Houston a letter containing notice identical to that given the barge master was delivered to Gulf.

On about December 22, 1982, Uiterwyk contracted with Gulf for the delivery of bunkers to the CARIBE MAR at Ceuta, Spanish Morocco. This was, of course, after they had received documents from Uiterwyk advising them of the prohibition of lien clause. The bunkers were loaded on the ship at Ceuta about January 11, 1983.

Uiterwyk did not pay for either the Houston or the Ceuta delivery. On May 13, 1983, Gulf had the CARIBE MAR seized at Gulfport, Mississippi pursuant to an in rem proceeding brought to secure payment for the bunkers. Following a bench trial, the district court held that Gulf had a valid maritime lien for the Houston delivery, but not for the January delivery in Ceuta. In this appeal, Fairplay urges that the district court erred in: (1) allowing Gulf to recover on the lien for the Houston delivery, and (2) denying Fairplay leave to assert a claim for price discrimination under the Robinson/Patman Act.[2] Gulf has cross-appealed, asserting that the district court erred in: (1) finding that Gulf was without a valid maritime lien on the CARIBE MAR for the Ceuta delivery; and (2) denying Gulf leave to amend to state an in personam claim against Fairplay for the Ceuta delivery. We conclude that the trial court did not err with respect to any of the points raised by the appeal or the cross appeal, and therefore affirm.

## II.

### A.

For the sake of logical development, we first address Gulf's contention that it had a valid maritime lien for the Ceuta delivery. In essence, Gulf's contention is that a 1971 amendment to the Maritime Lien Act, 46 U.S.C. § 971 et seq., was intended to prevent a prohibition of lien clause in a charter party from *ever* operating to deprive a supplier of necessaries to a vessel of a maritime lien on the vessel. This question has not been explicitly addressed by this circuit, although in *TTT Stevedores of Texas, Inc. v. M/V JAGAT VIJETA*, 696 F.2d 1135 (5th Cir.1983), the court assumed that actual knowledge would bar a lien. In *Lake Union Drydock Co. v. M/V POLAR VIKING*, 446 F.Supp. 1286 (W.D.Wash. 1978), the sole district court case which has come to light dealing directly with this problem,[3] the district court concluded in a thoughtful opinion that actual knowledge of a prohibition of lien clause would operate to bar the lien. From our own review

the marine fuel oil and it is agreed that seller will have and may assert a lien against such vessel for the amount of the purchase price ... and delivery of said marine fuel oil...."

2. Fairplay also contends that the district court erred in rejecting its pre-trial constitutional challenge to Rule C of the Supplemental Rules for Certain Admiralty and Maritime Claims, the rule under which the CARIBE MAR was seized. The constitutionality of Supplemental Rule C has been established in this circuit since *Mer-*

*chants National Bank v. Dredge General G.L. Gillespie*, 663 F.2d 1338 (5th Cir.1981), cert. dismissed, 456 U.S. 966, 102 S.Ct. 2263, 72 L.Ed.2d 865 (1982). We can hardly fault the district court for following unambiguous, controlling circuit precedent.

3. See also *Jan C. Uiterwyk Co., Inc. v. M/V MARE ARABICO*, 459 F.Supp. 1325, 1331 (D.Md. 1981) (following *Lake Union Drydock Co. v. M/V POLAR VIKING*).

of the 1971 amendment to the Lien Act and its legislative history, we agree and conclude that Gulf's construction of the effect of the 1971 amendment goes considerably beyond what Congress intended.

■ The practice of granting a supplier of necessaries a lien on the vessel supplied is a venerable one. E.g., *THE GENERAL SMITH*, 17 U.S. (4 Wheat.) 438, 4 L.Ed. 609 (1819). Prior to 1910, however, such a lien was hardly a certainty for the supplier of necessaries, since the law was shot through with exceptions.[4] In 1910, Congress enacted the Federal Maritime Lien Act, a concise piece of legislation intended to bring a degree of uniformity to the area of maritime liens.[5] Section 971 of the Lien Act provides:

> Any person furnishing repairs, supplies, towage, use of dry dock or marine railway, or other necessaries, to any vessel, whether foreign or domestic, upon the order of the owner of such vessel, or of a person authorized by the owner, shall have a maritime lien on the vessel, which may be enforced by suit in rem, and it shall not be necessary to allege or prove that credit was given to the vessel.

46 U.S.C. § 971.

Section 972 of the Act further provides:

> The following persons shall be presumed to have authority from the owner to procure repairs, supplies, towage, use of dry dock or marine railway, and other necessaries for the vessel: The managing owner, ship's husband, master, or any person to whom the management of the vessel at the port of supply is intrusted. No person tortiously or unlawfully in possession or charge of a vessel shall have authority to bind the vessel.

46 U.S.C. § 972.

The lien granted by § 971 and the presumption granted by § 972 were a boon for the materialman, but in practice much of their utility was nullified by section 973 as it read prior to the 1971 amendment:

> The officers and agents of a vessel specified in [section 972] shall be taken to include such officers and agents when appointed by a charterer, by an owner pro hac vice, or by an agreed purchaser in possession of the vessel; but nothing in this section shall be construed to confer a lien when the furnisher knew, or by exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, agreement for sale of the vessel, or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefor.

46 U.S.C. § 973 (amended 1971).

The duty of inquiry imposed by section 973 eventually became, through expansive judicial construction, a substantial hurdle for the materialman. The materialman was, in almost all cases, under a duty to ascertain the authority of the individual ordering supplies for a ship to incur liens on the vessel.[6] The practical effect of this duty was to allow the vessel owner, by insertion of a prohibition of lien clause in a charter party, to frequently deny any lien to the materialman regardless of the materialman's lack of actual knowledge of the clause.

■ In 1971, reacting to concerns that the difficulty of obtaining a lien was causing crippling losses to stevedoring contractors and others supplying services and goods to vessels, Congress amended section 973 of the Lien Act by deleting the language imposing on the materialman a duty of inquiry. The 1971 amendment de-

---

**4.** Professors Gilmore and Black provide a characteristically able discussion of this subject in Gilmore and Black, *The Law of Admiralty,* § 924–930 (1975).

**5.** The Lien Act was later codified, with minor modifications, in the Ship Mortgage Act of 1920. Merchant Marine Act of June 5, 1920, § 30, 41 Stat. 988.

**6.** See *United States v. Carver,* 260 U.S. 482, 43 S.Ct. 181, 67 L.Ed. 361 (1923); *Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co.,* 310 U.S. 268, 60 S.Ct. 937, 84 L.Ed. 1197 (1940), Gilmore & Black, supra, §§ 9–42, 9–43 at 674–77.

leted the words "but nothing in this chapter shall be construed to confer a lien when the furnisher knew, or by exercise of reasonable diligence could have ascertained, that because of the terms of the charter party ... the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel." [7] Gulf's argument is premised on the 1971 amendment's deletion of the language negating a lien when the furnisher of necessaries "knew" of a lack of authority, which leaves no indication on the face of the statute that knowledge will bar a lien. Thus, Gulf argues, the 1971 amendments were intended to render prohibition of lien clauses completely ineffectual, regardless of any knowledge possessed by the materialman. Gulf contends that the result in the *PO-LAR VIKING* case is contrary to the "clear, absolute language of the statute."

The language of the statute is actually not all that clear and absolute. Section 971 of the Lien Act grants a lien if necessaries are ordered by the owner "or a person authorized by the owner." Section 972 states a presumption that certain individuals are authorized by the owner to order necessaries. Section 973, since the 1971 amendment, serves only to include certain other individuals in the class presumed to be authorized by the owner under section 973. Prior to the 1971 amendment, section 973 also served to qualify the presumption stated in section 972.

■■■■ Although Gulf does not articulate the point, its argument is in effect that the 1971 amendment made the presumption of authority in section 972 a *conclusive* presumption. Conclusive presumptions are the exception rather than the rule, and we are reluctant to construe section 972 as establishing one without some clear indication that Congress so intended. On the other hand, the deletion of the qualifying language in section 973 leaves the statute without any indication that any particular

sort of proof will overcome the presumption. Since the language of the statute is to this extent ambiguous, we look to the legislative history to determine the Congressional intent. *Blum v. Stenson*, —— U.S. ——, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984).

Gulf cites several excerpts from the legislative history of the 1971 amendment in support of its argument. For example, the House report on the 1971 amendment states: "The bill would amend the Ship Mortgage Act to permit a supplier to acquire such a lien *despite* a 'prohibition of lien' clause in the charter party." H.R. 92–340, 92 Cong., 1st Sess., reprinted in 1971 U.S.Code Cong. & Ad.News 1363 (emphasis added). In addition, counsel for the Department of Commerce, in a letter to the House Committee, stated that: "The bills are evidently intended to grant liens on vessels to suppliers of necessaries *even if the supplier knows that the person ordering the necessaries are not authorized by the owners to bind the vessels.*" Id. at 1366. Finally, Gulf cites the remarks of one of the sponsors of the amendment, who stated that its purpose is to "[amend] the Ship Mortgage Act of 1920 so as to provide that owners and charterers of vessels ... by contract between themselves and other third parties, *will not be able to deny* to U.S. stevedores and other domestic concerns who are supplying necessaries to the vessel, the lien rights which these concerns would have had in the absence of such a contract." 177 Cong.Rec. 25,764 (1971) (remarks of Representative Pelly) (emphasis added).

We believe that the inferences to be drawn from these statements in the legislative history are too tenuous to form a basis for the interpretation of the 1971 amendments which Gulf urges. The comment in the House Report and Representative Pelly's remark do not, in fact, affirmatively state that knowledge of a prohibition of

7. Section 973 now reads:

The officers and agents of a vessel specified in section 972 of this title shall be taken to include such officers and agents when ap-

pointed by a charterer, by an owner pro hac vice, or by an agreed purchaser in possession of the vessel.

lien clause will not overcome the presumption of authority in section 972 and thus bar a lien. Only the comment in the Department of Commerce letter indicates at all clearly that the amendment was intended to completely nullify prohibition of lien clauses, and that comment is inconsistent with other, more authoritative portions of the legislative history.

 The primary concern of the legislators supporting the 1971 amendment was that materialmen and stevedores were frequently, because of the necessity for speed in provisioning a vessel and other reasons, unable to either ascertain the existence of a charter and determine if a prohibition of lien clause was present or to perform an adequate credit check on the entity ordering the supplies.[8] Removing the burden of the duty of inquiry from the materialman directly addresses this concern; allowing a materialman a lien despite his actual knowledge of a prohibition of lien clause does not. Several portions of the legislative history clearly indicate that the 1971 amendments were intended only to remove the duty of inquiry. For example, the House Committee Report states:

> Your committee wishes to emphasize that H.R. 6239 makes no change in maritime lien law, the priority of maritime liens, or in the accepted definition of necessaries. The practical effect of the bill is to negate the operation of a "no lien provision" in a charter to which the American materialism [sic] was not a party and *of which he had no knowledge* so that he will not be precluded from acquiring a lien for his services to which he would otherwise be entitled.

House Rep. No. 92–340, supra, at 1365 (emphasis added). This observation was repeated in substance from the floor of the House by Representatives Pelly and Dingle. 177 Cong.Rec. at 25,764 (1971). Finally, we note that one of the industry representatives urging passage of the amendment stated:

Because of the nature of the remedy, that is, the attachment and sale of the vessel, various methods have arisen over the years to allow the owner to limit his liability for liens.... It has been held to be the duty of a supplier to determine whether or not the vessel is under charter before he serves it and, if it be, whether the charter prohibits liens.... This requirement of inquiry was codified in the 1920 maritime lien law in section 30 (46 U.S.C. § 973). *It is this requirement of inquiry which the bills you are now considering would eliminate.*

Statement of Paul A. Amundsen, Executive Director, The American Association of Port Authorities (emphasis added).

These references in the legislative history, particularly the quoted portion of the House Committee Report, are dispositive of the question whether Congress intended the 1971 amendment to allow a materialman to obtain a lien regardless of actual knowledge of a prohibition of lien clause. This interpretation of the effect of the amendment on the § 972 presumption is consistent with the Congressional concern repeatedly emphasized in the legislative history. Suppliers of necessaries are afforded the protection of a lien even when, because of temporal or other limitations, they are unable to ascertain the existence of a prohibition of lien clause or check the credit of the buyer. These concerns are, of course, moot when a supplier has actual knowledge of a prohibition of lien clause. The supplier is then in a position to make an informed business decision, and may refuse to supply the vessel, make other arrangements for payment, or assume the risk. We therefore affirm the district court's denial of a lien for the Ceuta delivery which was made after Gulf received notice and had actual knowledge of the prohibition of lien clause.

### B.

Fairplay advances two arguments in support of its contention that the district court

---

**8.** See H.R.92–340, supra, at 3; 177 Cong.Rec. at 25,762 (1971) (remarks of Rep. Downing); Id. at 25,763 (remarks of Rep. Leggit); Id. (statement of Robert B. Duncan); Id. at 25,764 (remarks of Rep. Pelly).

**750**

erred in allowing Gulf to recover on its lien for the bunkers delivered at Houston. The first of these is that Gulf was relying solely on the personal credit of Uiterwyk, and thus waived its right to a maritime lien. Section 974 of the Maritime Lien Act, 46 U.S.C. § 974, indeed provides that a supplier of necessaries may waive his right to a lien "by agreement or otherwise."

This circuit's cases construing the waiver provision of section 974 place a heavy burden on the litigant attempting to prove that a violator waived a lien by looking to someone other than the vessel owner for payment. In *Sasportes v. M/V SOL DE COPACABANA*, 581 F.2d 1204 (5th Cir.1978), we noted that "even under the best of circumstances this position is difficult to sustain." Because of the strong presumption in favor of a maritime lien, we have consistently held that it is necessary that a litigant arguing for such a waiver prove that the creditor *deliberately intended* "to forego the valuable privilege which the law accords and look solely to the owner's personal credit." [9] Fairplay points to three facts which it contends establish that Gulf intended to rely solely upon the credit of Uiterwyk for payment: First, Gulf's long history of dealings with Uiterwyk, stretching back to 1964. Second, that Uiterwyk's credit limit with Gulf was at some points during that relationship as high as $1.2 million. Third, and most telling from Fairplay's point of view, that even after obtaining actual knowledge of the prohibition of lien clause, Gulf nevertheless supplied bunkers to the CARIBE MAR at Ceuta. The district court was fully justified in concluding that Fairplay failed to shoulder the heavy burden of proving a waiver through reliance on the personal credit of someone other than the vessel owner. The simple existence of a business relationship and credit arrangements could hardly be realistically construed as an intent or purpose by Gulf to waive its lien on the vessel. *See Gulf Trading & Transportation Co. v. Vessel HOEGH SHIELD*, 658 F.2d at 368. This is particularly so in light of the lien-reserving provisions in Gulf's Price Schedule & Fuel Contract. That Gulf supplied the bunkers in Ceuta after learning of the no-lien clause is likewise not the kind of concrete proof necessary to show a deliberate intent to forego a lien for the Houston delivery.

Fairplay's second argument for invalidating the Houston lien is that at some point prior to the loading of the bunkers on the CARIBE MAR, notice of the prohibition of lien clause was delivered to the master of the barge. The essence of Fairplay's argument is that since the master of the barge was entrusted with delivering the papers containing the technical specifications of the bunkers and with returning the delivery receipt to Gulf, the master was Gulf's agent for all purposes connected with these papers. Thus, Fairplay's reasoning runs, Gulf is chargeable with the notice of the prohibition of lien clause given to the master of the barge on the delivery receipt.

The district court correctly rejected this argument. Fairplay produced nothing to indicate that the master of the barge served as anything more than an intermediary in the delivery of these papers, a role which is not inconsistent with its status as an independent contractor delivering the fuel. Fairplay also contends that "the master and chief engineer of the vessel did all within their power to place the supplier on notice of the pertinent provisions of the charter party," although the master of the CARIBE MAR admittedly held extended consultations with Gulf personnel on the day of the Houston delivery, and no contention is made that Fairplay's employees brought the prohibition of lien clause to

9. *Point Landing, Inc. v. Alabama Dry Dock and Shipbuilding Co.*, 261 F.2d 861, 867 (5th Cir. 1958); *Sasportes v. M/V SOL DE COPACABANA*, 581 F.2d at 1209–10; *Gulf Trading & Transportation Co. v. Vessel HOEGH SHIELD*, 658 F.2d 363, 368 (5th Cir.1981), cert. denied, 457 U.S. 1119, 102 S.Ct. 2932, 73 L.Ed.2d 1332 (1982); *TTT Stevedores of Texas, Inc. v. M/V JAGAT VIJETA*, 696 F.2d 1135, 1139 (5th Cir.1983). Accord *Farrell Ocean Services, Inc. v. United States*, 681 F.2d 91, 93–94 (1st Cir.1982).

Gulf's attention. The record fully supports the district court's finding that notice to the barge personnel was not notice to Gulf.[10]

### III.

■ Fairplay also contends that the district court erred in refusing to allow it to amend its complaint to assert a claim of price discrimination under section 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a). This claim is based upon Gulf's charging Uiterwyk approximately $2.00 more per metric ton of fuel than it charged other customers in the Port of Houston. Whatever the merits of Fairplay's claim that this conduct constituted unlawful price discrimination, it is clear that it lacks standing to proceed under section 2(a). Standing to raise a claim under section 2(a) is determined by reference to section 4 of the Clayton Act: "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor ..." 15 U.S.C. § 15. This admittedly broad language has been interpreted in a practical fashion, "[to] exclude remote parties with possibly speculative injuries.... Courts have examined whether the plaintiff suffered a 'direct' injury as opposed to an 'incidental,' 'indirect' or 'remote' injury." *Schwimmer v. Sony Corp. of America,* 637 F.2d 41, 46–47 (2d Cir.1980); see also *Pan-Islamic Trade Corp. v. Exxon Corp.,* 632 F.2d 539, 547 n. 12 (5th Cir.1980), cert. denied, 454 U.S. 927, 102 S.Ct. 427, 70 L.Ed.2d 236 (1981). There is no allegation in this case that Fairplay was in competition with Uiterwyk, nor indeed is there any allegation of direct, indirect, or potential injury to Fairplay beyond

the seizure of their ship, an event which is not claimed to have any connection to the alleged price discrimination. The district court acted entirely properly in refusing to allow Fairplay to press this claim.

### IV.

About three weeks prior to the date of trial, Gulf attempted to amend its complaint to assert an in personam claim against Fairplay for the cost of the bunkers delivered at Ceuta. The district court denied the motion to amend as untimely, an action which Gulf contends was erroneous since under Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend should be granted when justice so requires.

■ In this circuit, the decision to grant leave to amend rests in the sound discretion of the trial court, and we review this decision only to the extent of determining whether there was an abuse of discretion. Major considerations in this inquiry include whether allowing amendment would cause prejudice to the non-moving party or undue delay in the proceedings.[11]

■ Gulf's attempted in personam claim is based on the clause in the Fairplay/Uiterwyk charter which provides that the vessel was to be redelivered to Fairplay with a minimum of 139 metric tons of fuel aboard. Thus, Gulf argues, a prima facie showing was made that Uiterwyk was acting for Fairplay as undisclosed principal, and that Fairplay received the benefit of the bunkers delivered at Ceuta. Since the charter party containing this clause was already before the court, and Fairplay was aware from the beginning of the litigation that the Ceuta delivery was at issue, Gulf

---

**10.** Since we find that the notice delivered to the master of the barge did not serve as notice to Gulf, we do not reach Gulf's argument, and Fairplay's vigorous contest of that argument, that in order to be effective, notice of the prohibition of lien clause must have been given before the contract for delivery of the bunkers was made. We therefore express no opinion whether this is a correct interpretation of *TTT Stevedores of Texas, Inc. v. M/V JAGAT VIJETA.* Finally, we find no substance to Fairplay's argument that Gulf should be denied a lien because it acted in "bad faith" by charging Uiterwyk

approximately $2.00 more per metric ton of fuel than it charged other customers in Houston. Fairplay does not dispute that Uiterwyk was given more favorable credit terms than other customers, and gives us no reason to question the district court's finding that Gulf was justified in charging Uiterwyk the higher price.

**11.** *Earlie v. Jacobs,* 745 F.2d 342, 345 (5th Cir. 1984); *Lewis v. Knutson,* 699 F.2d 230, 239 (5th Cir.1983).

argues that there would be no delay to the proceedings or prejudice to Fairplay. We do not find this argument convincing. It was well within the district court's discretion to reject Gulf's attempt to interject a completely new theory of recovery into the case three weeks before the trial.

AFFIRMED.