**CERES MARINE TERMINALS, INC., Plaintiff**

v.

**M/V HARMEN OLDENDORFF, et al., Defendants.**

Civ. A. No. S94–2587.

United States District Court, D. Maryland.

Sept. 14, 1995.

J. Marks Moore, III, Wilson, Elser, Moskowitz, Edelman & Dicker, Baltimore, MD, for plaintiff.

John H. West, III, Baltimore, MD, for defendants.

## MEMORANDUM AND ORDER

SMALKIN, District Judge.

This matter is before the Court on cross-motions for summary judgment. The motions have been thoroughly briefed, and no oral argument is deemed necessary. Local Rule 105.6. (D.Md.).

### I. Factual Background

The M/V HARMEN OLDENDORFF and the M/V CATHARINA OLDENDORFF are container cargo ships. Between July, 1993 and December, 1993, the M/V HARMEN OLDENDORFF and the M/V CATHARINA OLDENDORFF each made several calls at the Dundalk Marine Terminal in Baltimore, Maryland. During this time, the ships were owned by Egon Oldendorff (Hong Kong) Ltd. ("Oldendorff"), and chartered to Netumar Lines ("Netumar"). Some time before 1993, Netumar entered into a contract with Ceres Marine Terminal, Inc. ("Ceres"), the plaintiff in this action. Under the contract, Ceres was to provide stevedoring and other services at various ports, including Baltimore, to all ships under charter to Netumar. When the M/V HARMEN OLDENDORFF and the M/V CATHARINA OLDENDORFF called at Dundalk, Ceres provided marine terminal services to the vessels pursuant to the contract and billed Netumar for the services. Ceres billed Netumar $156,507.70 for services provided to the M/V HARMEN OLDENDORFF and $135,637.64 for services provided to the M/V CATHARINA OLDENDORFF between July and December, 1993.

In February, 1994, Netumar filed for bankruptcy. Netumar had not paid Ceres' bills for servicing the M/V HARMEN OLDENDORFF and the M/V CATHARINA OLDENDORFF. Ceres, an unsecured creditor of Netumar, filed in this Court a complaint *in rem* against the M/V HARMEN OLDENDORFF and the M/V CATHARINA OLDENDORFF, asserting that its provision of services to the vessels gave rise to maritime liens in its favor. Oldendorff, the owner of the vessels, answered Ceres' complaint. Ceres and Oldendorff subsequently filed cross motions for summary judgment with respect to all issues.

### II. Summary Judgment Standards

The court will grant summary judgment if there is "no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is material only if, under the governing substantive law, it affects the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Thus, where the record could not support a finding by the trier of fact for the non-movant, there is no genuine issue for trial and summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

Ceres and Oldendorff both argue that the material facts are undisputed and that they are entitled to judgment as a matter of law. Nonetheless, each party also suggests to this Court that, should its motion be denied, this Court should not grant the motion of the opposing party but should hold, instead, that

disputes of material fact preclude the entry of summary judgment.[1]

### III. The Cross–Motions for Summary Judgment

Ceres alleges that its provision of stevedoring services to the M/V HARMEN OLDENDORFF and the M/V CATHARINA OLDENDORFF gave rise to a maritime lien against the vessels in the amount of the value of its services. The parties agree that the maritime lien, if any, would arise under 46 U.S.C. §§ 31341–31343 (part of the Commercial Instruments and Maritime Liens Act, or "CIMLA").[2] The Act provides in part as follows:

"[A] person providing necessaries to a vessel on the order of the owner or a person authorized by the owner—

(1) has a maritime lien on the vessel;

(2) may bring a civil action in rem to enforce the lien; and

(3) is not required to allege or prove in the action that credit was given to the vessel."

46 U.S.C. § 31342. Section 31341 of CIMLA sets forth categories of persons who are presumed to be authorized by the owner to procure necessaries and, therefore, to create maritime liens. 46 U.S.C. § 31341.[3] The list includes "an officer or agent appointed by— . . . a charterer." 46 U.S.C. § 31341(4).

Ceres argues that its stevedoring services to the M/V HARMEN OLDENDORFF and the M/V CATHARINA OLDENDORFF were "necessaries" within the meaning of 46 U.S.C. § 31342, furnished on the order of a person with authority to bind the vessels under 46 U.S.C. § 31341, namely Netumar, the charterer. Thus, according to Ceres, its provision of services gave rise to a maritime lien against the vessels as a matter of law.

Oldendorff maintains that at least some of the services were not provided on the order of a person with authority under the Act to bind the vessels because they were provided by subcontractors of Ceres, rather than by Ceres itself. Oldendorff also contends that Ceres is precluded from asserting a lien against the M/V HARMEN OLDENDORFF and the M/V CATHARINA OLDENDORFF because it had actual notice of a no-lien provision in the time charters between Oldendorff and Netumar. Challenging specific charges, Oldendorff argues that some of Ceres' claims lie outside the admiralty jurisdiction of this Court and that other services were not "necessaries" under CIMLA.

### A. Can services provided by subcontractors give rise to a maritime lien?

It is undisputed that Ceres provided stevedoring services to the M/V HARMEN OLDENDORFF and the M/V CATHARINA OLDENDORFF at Netumar's request, pursuant to its contract with Netumar. CIMLA includes among the class of persons presumed to have authority to procure necessaries for a vessel the charterer and its agents. 46 U.S.C. § 31341(a)(4)(B). Thus, a time charterer ordinarily holds sufficient legal authority over the management of a chartered vessel to subject the vessel to maritime liens. *See also, e.g., S.C. State Ports Authority v. M/V TYSON LYKES*, 837 F.Supp. 1357 (D.S.C.1993); *Kaleidoscope Tours v. M/V "TROPICANA"*, 755 F.Supp. 382 (S.D.Fla. 1990). In light of the clarity of the applicable law, Oldendorff concedes that "Ceres, as a contractor engaged by Netumar, would [have] the statutory right to assert a maritime lien to collect payment for services which were necessaries." (Oldendorff's Mem.Supp.Mot.Summ.J. at 20). Nonetheless, Oldendorff contends that Ceres cannot assert a maritime lien with respect to payment for services performed by Ceres' sub-

---

**1.** Neither party specifically identifies any fact or set of facts that might be in dispute.

**2.** Before a recodification of Title 46 in 1989, that portion of CIMLA governing maritime liens was known as the Federal Maritime Liens Act ("FMLA").

**3.** Before the FMLA was amended in 1989, it provided in what is now § 31342 that "a person

providing necessaries to a vessel . . . on the order of a person listed in section 31341 of this title" was entitled to assert a maritime lien against the vessel. Although the statute now permits a maritime lien to arise when necessaries are provided "on the order of the owner or a person authorized by the owner," it seems clear that a person listed in § 31342 is a person "authorized by the owner" within the meaning of § 31341.

contractors, rather than by Ceres itself. According to Oldendorff, it is a rule of maritime law that "any subcontractor engaged by a contractor, like Ceres, is not considered authorized by the charterer or his agent and, therefore, the charges arising out of such subcontracts do not give rise to a maritime lien asserted by the contractor." (*Id.* at 21). In support of its argument, Oldendorff cites *S.C. Ports Authority v. M/V TYSON LYKES*, 837 F.Supp. at 1357; *Bonanni Ship Supply, Inc. v. United States*, 959 F.2d 1558, 1992 A.M.C. 2165 (11th Cir.1992), and *The Juniata*, 277 Fed. 438 (D.Md.1922). These cases do not support Oldendorff's position.

 Each of the cases cited by Oldendorff was a lien action brought against a vessel by a subcontractor who had allegedly provided the vessel with necessaries. The cases hold that a subcontractor generally cannot assert a maritime lien on its own behalf under CIMLA because it provides its services on the order of the contractor, rather than on the order of a person with statutory or other authority to procure necessaries. *Bonanni Ship Supply, Inc. v. United States*, 959 F.2d at 1564–65; *S.C. Ports Authority v. M/V TYSON LYKES*, 837 F.Supp. at 1366–68. *But see Marine Coatings of Alabama, Inc. v. U.S.*, 932 F.2d 1370, 1375–77 (11th Cir.1991). Contrary to Oldendorff's position, the cases do not hold that services performed by a subcontractor may never, as a matter of law, give rise to a maritime lien in favor of the contractor servicing the vessel. On the contrary, CIMLA clearly provides that "a person providing necessaries to a vessel" on the order of an authorized person "has a maritime lien on the vessel." 46 U.S.C. § 31342. All of the services that Ceres provided to the M/V HARMEN OLDENDORFF and the M/V CATHARINA OLDENDORFF, including those services performed by its subcontractors, were provided pursuant to Ceres' contract with Netumar. Thus, all of Ceres' services were provided on the order of a person with statutory authority to create liens under CIMLA.[4]

**B.** *Did Ceres have actual notice of Netumar's lack of authority to create maritime liens?*

The time charters of both the M/V HARMEN OLDENDORFF and the M/V CATHARINA OLDENDORFF contain the following provision: "Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the owners of the vessel." (Time charters at ¶ 18). Thus Netumar was not, in fact, authorized to create maritime liens against the vessels. Oldendorff takes the position that Ceres had "actual knowledge that the HARMEN OLDENDORFF and the CATHARINA OLDENDORFF were operating under a charter party which contained a no-lien provision" because the ships' masters placed " 'no-lien' stamps" on some of the receipts for Ceres' services. (Oldendorff's Mem.Supp.Mot.Summ.J. at 8). Ceres argues that it did not have actual notice of Netumar's lack of authority to create liens, and was therefore entitled to rely on the statutory presumption of the charterer's authority under CIMLA.

It is undisputed that Ceres did not have actual knowledge of the prohibition-of-lien provision in the vessels' charter parties. Ronald Rutolo, Ceres' Vice–President and Chief Financial and Administrative Officer, states in his affidavit that no agent of Ceres was familiar with the terms of the charter parties of the HARMEN OLDENDORFF and the CATHARINA OLDENDORFF, and, in particular, that Ceres did not know of the prohibition-of-lien clauses. Oldendorff does not controvert this evidence. Instead, Oldendorff argues that the no-lien stamp placed upon certain documents generated by Ceres constituted actual notice of Netumar's lack of authority. The resolution of the parties' dispute about notice turns largely upon on the 1971 amendments to the maritime liens act.

---

**4.** Cases cited by both sides show that contractors are routinely held to have maritime liens for the value of services provided by subcontractors. Indeed, the case principally relied on by Olden-

dorff for another portion of its argument, *Gulf Oil Trading Co. v. M/V CARIBE MAR*, 757 F.2d 743 (5th Cir.1985), involves just such a fact pattern.

924

Before 1971, the Federal Maritime Liens Act imposed upon suppliers the duty to inquire whether, despite apparent statutory authority, a person ordering necessaries for a vessel actually lacked authority "because of the terms of a charter party, agreement for sale of the vessel, or for any other reason." 46 U.S.C. § 973, (current version at 46 U.S.C § 31342 (1995)). Consequently, even where necessaries were ordered by a person presumptively authorized to create liens, the supplier's lien might be defeated by contractual provisions of which the supplier was unaware. The House Committee on Merchant Marine and Fisheries reported to Congress the consequences of the statutory scheme:

> "In order to protect themselves [sic], the American materialman must ascertain whether a vessel requesting necessaries is under charter and if so, whether the charter contains a 'no-lien provision.' Alternatively, he can make a credit check on the financial responsibility of the vessel operator. Generally, a vessel requiring necessaries is unable to give sufficient notice so that the American materialman can do either, and he usually ends up assuming the risk that his bill will be paid. This has resulted in substantial losses, or in attempting to collect money due him, costly litigation."

H.R.Rep. No. 92–340, 92d Cong., 1st Sess., *reprinted in* 1971 U.S.C.C.A.N. 1363, 1364. Responding to losses suffered by American materialmen, Congress determined that the maritime liens act, as then written, placed an unacceptable burden on maritime suppliers. *See generally Gulf Oil Trading Co. v. M/V CARIBE MAR*, 757 F.2d at 747–749; E.E. Jhirad & A. Sann, 2 *Benedict on Admiralty*, § 40 at 3–50 to 3–53 (6th ed. 1994) (hereinafter "Benedict"). Congress amended the Federal Maritime Liens Act to eliminate the supplier's duty of reasonable inquiry. As a result of the amendment,

> "[t]he owner of a vessel must now establish that the materialman had actual knowledge of a no-lien clause if he is to overcome the materialman's statutory presumption. The imposition of this burden is supported by the legislative history. Congress intended to place the greater burden upon the ves-

sel owner: 'As a practical matter, the owner can more easily protect himself contractually by bonds or otherwise at the time he charters the vessel, than can the American materialman who furnishes necessaries to a vessel under great economic pressure to put out to sea.' "

*Lake U. Drydock Co. v. M/V POLAR VIKING*, 446 F.Supp. 1286, 1291 (W.D.Wash. 1978) (quoting 2 U.S.C.C.A.N. 1365 (1971)). *See also Gulf Oil Trading Co. v. M/V CARIBE MAR*, 757 F.2d at 747–748. Under current law, therefore, a supplier of necessaries to a vessel is entitled to rely upon the statutory presumption of authority under CIMLA unless a vessel's owner gives actual notice that authority is, in fact, lacking. *Marine Fuel Supply & Towing, Inc. v. M/V KEN LUCKY,* 859 F.2d 1405, 1410 (9th Cir. 1988); *Gulf Oil Trading Co. v. M/V CARIBE MAR,* 757 F.2d 743, 750 (5th Cir.1985); *S.C. State Ports Auth. v. M/V TYSON LYKES,* 837 F.Supp. at 1368; *Jan C. Uiterwyk Co. v. MV MARE ARABICO,* 459 F.Supp. 1325, 1331 (D.Md.1978). A supplier has "no duty to inquire, nor an 'obligation to investigate.' It is the responsibility of the owners of the [vessel] to convey sufficient notice ..." *Gulf Oil Trading Co. v. M/V FREEDOM,* 1985 A.M.C. 2738, 2742, 1985 WL 4787 (D.Or. 1985). Accordingly, the party seeking to bar a supplier's maritime lien has the burden of proving that the supplier actually knew of a prohibition-of-lien clause in the charter party or other contract. *Marine Fuel Supply & Towing,* 859 F.2d at 1410–1411; *Belcher Oil Co. v. M/V GARDENIA,* 766 F.2d 1508, 1512 (11th Cir.1985); *Gulf Oil Trading Co. v. M/V FREEDOM,* 1985 A.M.C. 2738, 1985 WL 4787 (D.Or.1985); *Jan. C. Uiterwyk Co., Inc.,* 459 F.Supp. at 1331.

Actual notice of a no-lien provision or of other lack of authority defeats a maritime lien because "[t]he supplier is then in a position to make an informed business decision, and may refuse to supply the vessel, make other arrangements for payment, or assume the risk." *Gulf Oil Trading Co. v. M/V CARIBE MAR,* 757 F.2d 743, 749 (5th Cir. 1985). Thus, actual notice to a supplier is ordinarily ineffective to bar a maritime lien if it is given after the necessaries have been

provided to the vessel. *M/V CARIBE MAR*, 757 F.2d at 749; *Gulf Oil Trading Co. v. M/V FREEDOM*, 1985 A.M.C. 2738, 2739, 1985 WL 2738 (D.Or.1985); *Atlantic & Gulf Stevedores, Inc. v. M.V. ROSA ROTH*, 587 F.Supp. 1033, 1034 (S.D.N.Y.1984).

■ Oldendorff argues that Ceres had actual knowledge that Netumar was without authority to incur liens against the M/V HARMEN OLDENDORFF and the M/V CATHARINA OLDENDORFF. The factual basis for Oldendorff's claim is the presence of a stamp placed on certain documents by the masters of the M/V HARMEN OLDENDORFF and the M/V CATHARINA OLDENDORFF in the course of some of the vessels' calls at the Dundalk terminal.[5] There is no dispute between the parties about the circumstances surrounding the use of the stamp. Ceres performed the work requested by Netumar and then prepared a form itemizing the completed tasks, a "labor slip," for signature by the vessel's master.[6] (Affidavit of Ann S. Gilchrist, Ceres' Regional Manager of Accounting and Administration, ¶¶ 2–4); (Oldendorff's Mem.Supp.Mot. Summ.J. at 9–10). The masters of the M/V HARMEN OLDENDORFF and the M/V CATHARINA OLDENDORFF signed a labor slip after each of the CATHARINA OLDENDORFF's three calls at Dundalk, and after three of the HARMEN OLDENDORFF's four calls. Sometimes, the master would stamp the labor slip before signing it with a stamp which read as follows:

"This service/supply/bill is for the account of vessel's Timecharterers, Messrs. Netumar. On behalf of vessel's owners I herewith declare that neither Owners nor vessel are responsible for payment of this service/supply/bill."

The stamp was placed upon two of four slips relating to work performed for the HARMEN OLDENDORFF, and two of three slips relating to work performed for the CATHARINA OLDENDORFF. The completed labor slips were used by Ceres' billing department to prepare invoices for Netumar. (Gilchrist Deposition at p. 51; Oldendorff's Mem.Supp.Mot.Summ.J. at 9).

The parties vigorously dispute the legal effect of the no-lien stamps. Oldendorff contends that the earliest stamped document, a labor slip identifying work performed on the CATHARINA OLDENDORFF on August 31 to September 1, 1993, gave Ceres actual notice that Netumar alone was responsible for paying bills subsequently incurred on behalf of both ships.[7] Specifically, Oldendorff takes the position that the first use of the stamp gave Ceres "actual knowledge that the HARMEN OLDENDORFF and CATHARINA OLDENDORFF were operating under a charter party which contained a no-lien provision." (Oldendorff's Mem.Supp.Mot. Summ.J. at 8). Thus, according to Oldendorff, "as a matter of law, Ceres is not entitled to assert a maritime lien against either the HARMEN OLDENDORFF or the CATHARINA OLDENDORFF for services rendered thereafter." (*Id.* at 4).

Ceres, on the other hand, denies that the stamp gave adequate notice that Netumar was unauthorized to incur liens because "the only effective stamp is one that expressly refers to the existence of a no-lien clause." (Ceres' Rep. to Oldendorff's Resp. to Ceres' Mot.Summ.J. at 15). Ceres also contends that the stamps were ineffective to bar a lien because they were placed on the labor slips after the work had been performed for the vessels.

Both sides have overlooked, to some extent, the distinction between notice to Ceres of the prohibition-of-lien clause in the charter party between Netumar and Oldendorff and notice to Ceres that Netumar was not autho-

---

5. Oldendorff alleges no other facts which might tend to show that Ceres had actual notice that Netumar did not have authority to create maritime liens against the vessels.

6. Oldendorff refers to these forms as "Superintendent Reports." Ceres calls them "labor slips." Since Ceres was responsible for creating the forms, this Court adopts Ceres' terminology.

7. Although the record shows that the stamp was first used in August, 1993, Oldendorff challenges Ceres' right to a maritime lien for services performed for the HARMEN OLDENDORFF on July 25, 1993. Oldendorff does not allege any facts which might support its contention that Ceres had notice that Netumar was not authorized to incur liens against the vessel with respect to this call.

rized on specific occasions to incur liens against the vessels. The stamp, which declares "on behalf of Owners" that "neither Owners nor vessel are responsible for payment of this . . . bill," does not give notice of the no-lien clause.[8] Rather, it merely gives notice that Netumar was not authorized to incur liens against the vessels with respect to the specific services invoiced in each stamped labor slip.

The use of the stamp is the sole factual basis for Oldendorff's claim that Ceres had actual notice of Netumar's lack of authority to create a lien. On three of the seven calls in question, no stamp was placed on the labor slip. Since the stamp merely stated that there was no recourse against the vessel with respect to the particular services described on the labor slip, Oldendorff cannot rely on the presence of a stamp on one labor slip as evidence of notice with respect to other, unstamped slips.[9] As a matter of law, Oldendorff has failed to discharge its burden of establishing actual notice with respect to the calls of the M/V HARMEN OLDENDORFF on July 25, 1993 and October 22, 1993 and of the M/V CATHARINA OLDENDORFF on October 14, 1993, none of which involved a stamped labor slip.

■ Ceres argues that the stamps were ineffective as a matter of law to prevent a maritime lien from arising because they did not give notice of Netumar's lack of authority to create liens until after Ceres had provided its services to the ships. Oldendorff responds that the notice given to Ceres by the first use of the stamp in August, 1993, prevented maritime liens from arising with respect to services rendered to either vessel thereafter. Oldendorff cites *Gulf Oil Trading Co. v. M/V CARIBE MAR*, 757 F.2d 743 (5th Cir.1985), as a "case directly on point with the case at hand." (Oldendorff Mem. Supp.Mot.Summ.J. at 10). This Court

agrees that the reasoning of *CARIBE MAR* is persuasive on the question of notice. The facts of the present case, however, are materially different from those in *CARIBE MAR*.

In *Gulf Oil Trading Co. v. M/V CARIBE MAR*, 757 F.2d 743 (5th Cir.1985), Gulf engaged an independent contractor to deliver fuel bunkers to the M/V CARIBE MAR. At some time before the fuel was delivered, the vessel's master delivered papers to the independent contractor, giving notice that the CARIBE MAR was chartered, and that the charter party contained a prohibition-of-lien provision. 757 F.2d at 750. Thereafter, the vessel's owners sent a letter directly to Gulf, informing Gulf of the no-lien term of the charter. Gulf later provided a second supply of fuel for the CARIBE MAR. 757 F.2d at 746. The charterer failed to pay for either fuel delivery, and Gulf brought an action against the vessel, alleging maritime liens with respect to both deliveries.

The Court of Appeals for the Fifth Circuit affirmed the district court's holding that Gulf had a valid maritime lien for the first delivery, but not for the second. The appellate court recognized that "[s]uppliers of necessaries are afforded the protection of a lien even when, because of temporal or other limitations, they are unable to ascertain the existence of a prohibition of lien clause or check the credit of the buyer." *Gulf Oil Trading Co. v. M/V CARIBE MAR*, 757 F.2d 743, 749 (5th Cir.1985). The court went on to observe that such protection was inappropriate where the supplier had actual knowledge of a no-lien clause, since the supplier was then "in a position to make an informed business decision, and may refuse to supply the vessel, make other arrangements for payment, or assume the risk." *Ibid.* Since Gulf had received the letter informing it of the no-lien provision before the second delivery of fuel to the CARIBE MAR, Gulf was not

**8.** Although Ceres coyly suggests that it did not know that M/V HARMEN OLDENDORFF and the M/V CATHARINA OLDENDORFF were chartered, conceding only that it "may have assumed that the vessels were chartered by Netumar," it is patently evident that Ceres must have known of the charters. Indeed, Ceres claims that its lien arose in connection with services which it provided pursuant to a contract with Netumar,

whereby Ceres would service vessels chartered by Netumar at East coast ports.

**9.** Even if the stamp had given notice of the no lien provision in one vessel's charter party, Oldendorff set forth no facts to support its contention that notice with respect to the CATHARINA OLDENDORFF should be binding against the HARMEN OLDENDORFF, or vice versa.

entitled to assert a lien with respect to that delivery.

Contrary to Oldendorff's position, the material facts in *M/V CARIBE MAR* are entirely different from those in the present case. In *CARIBE MAR*, Gulf received a letter which gave it actual notice of the lien prohibition in the CARIBE MAR's charter party. Oldendorff does not even allege that it ever made such a communication to Ceres. Furthermore, to the extent that the stamped receipts from the first fuel delivery to the CARIBE MAR constituted notice to Gulf, they did so by informing Gulf of the lien prohibition.[10] By contrast, the stamps in the present case did not state that Netumar generally lacked authority to incur liens, but merely stated that Netumar was liable to pay for the specific services rendered.

This Court finds persuasive the Fifth Circuit's analysis of the significance of timely notice in *CARIBE MAR*. Under this analysis, Ceres is entitled to assert a lien for necessaries it supplied to the HARMEN OLDENDORFF and to the CATHARINA OLDENDORFF before it received actual notice that it would be unable to proceed against the vessels for payment in the event of Netumar's default. The masters of the HARMEN OLDENDORFF and the CATHARINA OLDENDORFF stamped Ceres' labor slips *after* Ceres had performed its work for the vessels. Under these circumstances, any notice given by the stamp was insufficient to destroy Ceres' right to rely on the statutory presumption of Netumar's authority to create

liens under CIMLA. Having already supplied the vessels with necessaries, Ceres was not in a position to make other arrangements with Netumar or Oldendorff to ensure that it would ultimately be paid. Thus, the stamping of the labor slips was insufficient as a matter of law to bar the creation of maritime liens with respect to the services already performed by Ceres. *See Gulf Oil Trading Co. v. M/V CARIBE MAR*, 757 F.2d 743 (5th Cir.1985); *Gulf Oil Trading Co. v. M/V FREEDOM*, 1985 A.M.C. 2738, 2739, 1985 WL 4787 (D.Or.1985); *Atlantic & Gulf Stevedores, Inc. v. M.V ROSA ROTH*, 587 F.Supp. 1033, 1034 (S.D.N.Y.1984).[11]

*C. Were Ceres' services "necessaries" within the meaning of CIMLA?*

Ceres' asserted maritime lien encompasses charges for the following services; stevedoring, container stuffing and stripping, crane rental, dockage, wharfage, detention, container royalties, container mounting and grounding, and TIR charges. Oldendorff does not dispute that Ceres provided these services. Rather, it contends that, as a matter of law, their provision cannot give rise to maritime liens. Oldendorff asserts that the TIR charges, mounting and grounding charges and stuffing and stripping charges are not maritime in nature and, consequently, do not fall within the admiralty jurisdiction of this court. In addition, Oldendorff argues that the charges for detention and container royalties are not "necessaries" within the meaning of CIMLA.[12]

**10.** The court held that the stamped receipts did not constitute actual notice to Gulf because the independent contractor who supplied the vessel was not Gulf's agent for the purpose of receiving notice. *Gulf Oil Trading Co. v. M/V CARIBE MAR*, 757 F.2d 743, 750 (5th Cir.1985).

**11.** Ceres also contends that the stamps were ineffective to bar a maritime lien because the labor slips were merely a part of the billing process, and were not always presented after work had been performed. Ceres points out that Oldendorff took no other steps to inform it of the prohibition-of-liens clause, for example by informing it by letter or by posting a notice in the wheelhouse of either vessel. Ceres concludes that "[s]uch an entirely haphazard approach by Oldendorff cannot be deemed sufficient to satisfy its heavy burden of affirmatively advising Ceres of the existence of a no-lien clause in its charter

parties with Netumar." (Ceres' Opp. to Oldendorff's Mot.Summ.J. at 15).

However haphazard Oldendorff's methods of giving notice, if they were successful, then Ceres' actual notice of Netumar's lack of authority would destroy its asserted lien. Since Oldendorff failed to give actual notice for other reasons, however, this Court need not decide whether summary judgment in Ceres' favor would be appropriate on this alternative ground.

**12.** Oldendorff does not seriously contend that dockage, wharfage and crane rental are not "necessaries." Indeed, it could not reasonably make such an argument. *See, e.g., Bermuda Express, N.V. v. M/V LITSA*, 872 F.2d 554, 563 (3d Cir.1989); *TTT Stevedores of Texas, Inc,. v. M/V JAGAT VIJETA*, 696 F.2d 1135, 1138 (5th Cir. 1983); *Atlantic & Gulf Stevedores v. M/V GRAND LOYALTY*, 608 F.2d 197, 201 (5th Cir.1979); *S.C.*

### a. Stuffing, stripping, grounding, mounting and TIR charges.

■ Oldendorff contends that the dispute surrounding Ceres' charges for container stuffing, stripping, mounting and grounding and TIR charges fall outside admiralty jurisdiction.[13] Oldendorff adopts the definitions of these services offered by Edward Heinlein, Ceres' former General Manager for Port Operations in Baltimore. (Oldendorff's Resp. to Ceres' Mot.Summ.J. at 14–15). Heinlein described a TIR charge as a charge levied on each container as it enters or leaves the Ceres terminal, and stuffing and stripping charges as charges for loading and unloading the containers. Mounting and grounding charges are charges for placing containers onto truck chassis or removing them therefrom, either at the beginning or the end of their voyage. Oldendorff contends that none of these charges fall within admiralty jurisdiction because they generally take place on land and are not "directly related in time, place and character to the actual loading onto or discharge from a vessel." (Oldendorff Resp. to Ceres' Mot. Summ.J. at 14).

Oldendorff cites *Luvi Trucking, Inc. v. Sea–Land Service, Inc.*, 650 F.2d 371 (1st Cir.1981), as holding that admiralty jurisdiction depends upon the spatial and temporal proximity of a disputed matter to the loading or unloading of a ship. The legal standard set forth in *Luvi Trucking*, however, is not pertinent to the present case. *Luvi Trucking* involved a contract for the haulage of freight, by land, between two ports. As the *Luvi Trucking* court made clear, the question before it was the scope of admiralty jurisdiction over contract actions involving cargo. 650 F.2d at 373. By contrast, the case before this Court is not a contract action with some tangential relationship to

maritime affairs. Rather, it is an action to enforce a maritime lien, based on a contract between a stevedore and a charterer for maritime services. The Fourth Circuit has recently stated that. among others, "contracts for wharfage, dockage and crane rentals are maritime." *S.C. State Ports Auth. v. Silver Anchor, S.A.*, 23 F.3d 842, 846 n. 3 (4th Cir.1994). Plainly, the present action, in its entirety, falls within the maritime jurisdiction of this Court.[14]

### b. Detention and Container Royalties.

■ Oldendorff also argues that Ceres' charges for detention and for container royalties were not charges for "necessaries" within the meaning of CIMLA.[15] Again, Oldendorff fails to take account of clearly applicable law. "[T]he maritime lien for necessaries ... encompasses those payments covered by the vessel's contract for services which stevedoring companies must pay pursuant to the terms of a collective bargaining agreement." *Bermuda Express, N.V. v. M/V LIT-SA*, 872 F.2d 554, 563 (3d Cir.1989). The uncontroverted testimony of Ann Gilchrist establishes that Ceres was required to pay detention charges and container royalties pursuant to the International Longshoremen's Association's Collective Bargaining Agreement in effect at the time. As a matter of law, these charges were necessaries capable of giving rise to a maritime lien.

### IV. Conclusion

No facts material to this Court's decision are in dispute. Ceres' services to the M/V HARMEN OLDENDORFF and the M/V CATHARINA OLDENDORFF were provided on the order of the charterer Netumar, a person with presumptive authority under CIMLA to create liens against the vessels.

*State Ports Auth. v. M/V TYSON LYKES*, 837 F.Supp. 1357, 1365–66 (D.S.C.1993). Intead, Oldendorff challenged these charges on the meritless ground that the services were provided by subcontractors of Ceres, rather than by Ceres itself.

13. Oldendorff does not allege that the TIR charges and the charges for stuffing, stripping, mounting and grounding are not "necessaries" within the meaning of CIMLA.

14. To the extent that the opinion of the United States District Court for the District of South Carolina in *S.C. State Ports Auth. v. M/V TYSON LYKES*, 837 F.Supp. 1357 (1993) is inconsistent with this analysis, this Court declines to follow it.

15. Oldendorff first argues that these services are not necessaries because they are not directly related to loading and unloading a vessel. As earlier stated, this legal standard is irrelevant to the present case.

As a matter of law, Ceres did not receive timely notice that Netumar in fact lacked authority to create liens against the vessels. Furthermore, all of the services rendered to the vessels by Ceres were "necessaries" within the meaning of CIMLA. Consequently, Ceres has a valid maritime lien against the M/V HARMEN OLDENDORFF in the amount of $156,089.81 and against the M/V CATHARINA OLDENDORFF in the amount of $135,637.64.

### V. *Prejudgment Interest*

This Court has discretion to award prejudgment interest in maritime cases. Such an award is "almost automatic unless the manner in which the claim has been prosecuted is properly subject to criticism." *W.R. Grace & Co. v. S.C. Loveland Co.,* 1990 A.M.C. 2515, 2520, 1990 WL 13014 (4th Cir. 1990). Nothing in the record suggests that Ceres' prosecution of its claims was in any way improper. The Court therefore awards prejudgment interest in Ceres' favor.

The parties have addressed neither the method of calculating prejudgment interest, nor the rate at which interest should be calculated. The Court directs the parties to try to reach agreement on these issues. The parties are to report whether they have agreed on these matters within fifteen days of the date hereof. Should no agreement be forthcoming, the Court will schedule a hearing to establish the amount of prejudgment interest to which Ceres is entitled.

For the reasons stated above, plaintiff Ceres' motion for summary judgment is *granted.* Claimant Oldendorff's motion for summary judgment is *denied.* It is so ordered.