UNITED STATES COURT OF APPEALS
For the Fifth Circuit

_____

No. 98-31382
_____


RACAL SURVEY U.S.A., INC.; NCS INTERNATIONAL, INC.,

Plaintiffs - Counter Defendants - Appellees,


VERSUS


M/V COUNT FLEET, her engines, tackle, furniture
& appurtenances in rem; ET AL.,

Defendants

TIDEWATER MARINE INTERNATIONAL, INC.,

Counter Claimant - Appellant.


-----------------------------------------------------


_____

No. 98-31383
_____


RACAL SURVEY U.S.A., INC.; NCS INTERNATIONAL, INC.,

Plaintiffs,


VERSUS


M/V COUNT FLEET, her engines, tackle, furniture
& appurtenances in rem, ET AL.,

**TIDEWATER MARINE INTERNATIONAL, INC.,**

**Intervenor Defendant - Appellant - Cross-Appellee,**

**VERSUS**

**INPUT/OUTPUT, INC.,**

**Intervenor Plaintiff - Appellee - Cross-Appellant.**

---

Appeals from the United States District Court
For the Western District of Louisiana

---

October 24, 2000

Before EMILIO M. GARZA, DeMOSS, and STEWART, Circuit Judges.

DeMOSS, Circuit Judge:

In these consolidated appeals, Tidewater Marine International, Inc., ("TMI") primarily challenges two of the district court's rulings arising out of an admiralty dispute. First, TMI argues that the district court erred in finding a maritime lien in favor of Racal Survey U.S.A., Inc., and NCS International, Inc., (collectively "Racal") over various vessels chartered by Coastline Geophysical, Inc., ("Coastline") from TMI. Second, TMI maintains that the district court improperly denied TMI a maritime lien over certain seismic equipment sold by Input/Output, Inc., ("Input") to Coastline.

Because Racal did not rely on the credit of the arrested

vessels or provide any necessaries to those boats, we reverse the district court's judgment granting a maritime lien in favor of Racal. We, however, conclude that the district court did not err with respect to its ruling denying TMI a maritime lien over the seismic equipment sold by Input and, therefore, affirm the district court's ruling on that issue.

## I. BACKGROUND

On February 16, 1996, Coastline entered into a Blanket Time Charter Agreement ("First Charter") with Tidewater Marine, Inc., ("Tidewater Marine")[1]. According to that charter, Tidewater Marine was to provide vessels suited for offshore activities in the mineral and oil industry. Those vessels were to embark on a seismic expedition in the Gulf of Mexico in search of oil and gas. In conformance with the First Charter, on March 11, 1996, the two parties executed separate letter agreements for four vessels: 1) the M/V CAMERON SEAHORSE, 2) the M/V WHITTIE TIDE, 3) the M/V TAYLOR TIDE, and 4) the M/V TOUPS TIDE.

To do its seismic operations, Coastline required certain technical equipment. As a result, it made various inquiries to Racal, who submitted a proposal to Coastline on February 12, 1996.

---

[1]Tidewater Marine is a sister company of TMI. Both Tidewater Marine and TMI are subsidiaries of Tidewater, Inc. ("Tidewater"). Tidewater Marine operates vessels in domestic waters while TMI operates vessels in foreign waters. Neither Tidewater Marine or Tidewater is a party to this litigation.

That proposal outlined the equipment to be leased and the services to be rendered to Coastline for its operations. Furthermore, Racal submitted another proposal on March 25, 1996, which pertained to the sale of certain other equipment to Coastline. On March 27, 1996, Racal shipped all of the required equipment to the shipyard for installation. The equipment would allow the four vessels to coordinate information among themselves to better facilitate the search for oil and gas. Two of the vessels would lay cable upon the ocean floor while a third, the source vessel, would send information along the cable via airgun shots from caterpillar machinery located on the vessel. A fourth vessel would record the data generated from these airgun shots. In addition to Racal's equipment, other equipment provided by Input was installed on the chartered vessels.

After the First Charter terminated, Coastline executed a second Blanket Time Charter ("Second Charter") on August 13, 1996. Although similar in nature to the earlier charter agreement, the Second Charter differed in three respects: 1) TMI, not Tidewater Marine, was the vessel owner; 2) four different vessels would be used; and 3) the seismic operations would be conducted off the coast of Africa, not in the Gulf of Mexico. On August 19, 1996, Coastline again agreed to separate letter agreements for four vessels: 1) the M/V SECRETARIAT, 2) the M/V COUNT FLEET, 3) the M/V COUNT TURF, and 4) the M/V MILTON TIDE. Between August 28, 1996, and September 2, 1996, the equipment that had been placed onto the

4

First Charter vessels was transferred to the four new vessels at Quality Shipyards, a subsidiary owned by Tidewater.

When the Africa survey concluded, the four vessels chartered for that trip sailed to Trinidad and Tobago for another job. During that voyage, the charter between Coastline and TMI terminated due to non-payment of charter hire, but Coastline's equipment remained on board. Besides failing to pay TMI, Coastline became insolvent and defaulted on its payments to Racal and Input.[2] Upon the return of the Second Charter vessels to the United States, Racal arrested three of them. TMI secured the release of the vessels and removed and stored Coastline's equipment. Shortly thereafter, TMI arrested Coastline's equipment, in some of which Input claimed a UCC security interest, because of Coastline's non-payment of charter hire.

In district court, Racal filed a motion for partial summary judgment requesting determination of the validity of its lien under the Federal Maritime Lien Act ("FMLA"), 46 U.S.C. § 31342. TMI opposed that motion and filed a cross-motion for summary judgment. After taking the motions under advisement, the district court ruled in favor of Racal. Moreover, the district court granted Input's "Application for Petitioner to Show Cause Instanter or,

_____

[2]With respect to Coastline's obligations to Input, they derived from Coastline's failure to pay First Interstate Bank ("First Interstate"), which had financed Coastline's purchases from Input. Input had guaranteed those purchases, and after Coastline's default to First Interstate, Input paid those obligations and took the place of First Interstate.

5

Alternatively, Motion for Summary Judgment" and denied TMI's motion for summary judgment seeking recognition of its claimed maritime lien in the Coastline equipment.

TMI now appeals both of those rulings.

## II. STANDARD OF REVIEW

We review a grant or denial of summary judgment de novo. *See Webb v. Cardiothoracic Surgery Assocs., P.A.*, 139 F.3d 532, 536 (5th Cir. 1998). Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits filed in support of the motion, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). The summary judgment evidence is reviewed in the light most favorable to the nonmovant. *See Melton v. Teachers Ins. & Annuity Ass'n*, 114 F.3d 557, 559 (5th Cir. 1997). If the moving party meets its initial burden of showing that there is no genuine issue, then the burden shifts to the nonmovant to set forth specific facts showing the existence of a genuine issue. *See* Fed. R. Civ. P. 56(e). The nonmovant cannot satisfy his summary judgment burden with conclusional allegations, unsubstantiated assertions, or only a scintilla of evidence. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). If the nonmovant fails to respond, then summary judgment, if appropriate,

shall be entered against that party. *See* Fed. R. Civ. P. 56(e).

## III. DISCUSSION

Both of TMI's appeals involve the concept of a maritime lien, a device developed as a necessary incident to the operation of vessels. *Piedmont & George's Creek Coal Co. v. Seaboard Fisheries Co.*, 41 S. Ct. 1, 3 (1920). Because a ship moves from place to place, it is peculiarly subject to vicissitudes that would compel abandonment of vessel or voyage, unless repairs and supplies are promptly furnished. *Id.* Moreover, a ship is often absent from her home port without access to funds and, as a result, must be able to obtain upon her own account needed repairs and supplies. *Id.* That and the resulting need to ensure that a ship did not sail away from its debts contributed to the creation of the maritime lien. *See Equilease Corp. v. M/V SAMPSON*, 793 F.2d 598, 602 (5th Cir. 1986) (en banc).

Prior to 1910, however, a maritime lien was hardly a certainty for the supplier of necessaries because the law was full of exceptions. *Gulf Oil Trading Co. v. M/V CARIBE MAR*, 757 F.2d 743, 747 (5th Cir. 1985). To remedy that situation, Congress in 1910 enacted the Federal Maritime Lien Act ("FMLA"), 46 U.S.C. §§ 971-975,[3] to bring a degree of uniformity to the area of maritime

---

[3]Congress superseded that prior version of the FMLA in 1988 and recodified much of it at 46 U.S.C. §§ 31341-31343.

7

liens. *Id.* The FMLA essentially preempted the various state statutes with respect to the conferral of maritime liens for repairs, supplies, and other necessaries. *Equilease*, 793 F.2d at 602-03. And it eliminated the distinction that had been drawn between a vessel in her home port and a vessel in a foreign port. *Id.* Before the FMLA, a lien could be given for necessaries furnished to a vessel in a port of a foreign state if the necessaries were furnished upon the credit of the vessel, but no such lien could be given for necessaries furnished in a vessel's home port or state. *Id.*

Section 971 of the FMLA provided a maritime lien to "any person furnishing repairs, supplies, towage, use of dry dock or marine railway, or other necessaries, to any vessel, whether foreign or domestic, upon the order of the owner of such vessel, or of a person authorized by the owner," and it further stated that the furnishing person need not "allege or prove that credit was given to the vessel." 46 U.S.C. § 971 (superseded 1988). Section 972 created a presumption that the managing owner, ship's husband, master, or any person to whom the management of the vessel at the port of supply was intrusted had authority to procure necessaries. Section 973 added to the individuals presumed to have authority to procure necessaries under § 972, including those officers and agents appointed by a charterer, by an owner pro hac vice, or by an agreed purchaser in possession of the vessel. Although that

8

section broadened the group of individuals presumed to have authority to procure necessaries, it also placed a significant limitation and duty upon the supplier of necessaries. Under § 973, if the furnisher knew, or by exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, agreement for sale of the vessel, or for any other reason, the person ordering repairs, supplies, or other necessaries was without authority to bind the vessel, then a maritime lien could not attach. In 1971, Congress deleted the "exercise of reasonable diligence" language because that language had severely hampered suppliers' ability to obtain a maritime lien.[4] *Gulf Oil*, 757 F.2d at 747-48. As for § 974, that section pertained to a furnisher's ability to waive its right to a maritime lien by agreement or otherwise.

In 1988, Congress superseded the prior version of the FMLA and enacted new provisions primarily at 46 U.S.C. §§ 31341-31343.[5] *See*

---

[4]Congress also deleted the reference to knowledge of a prohibition of lien clause as creating a bar to the formation of a maritime lien. *See Gulf Oil*, 757 F.2d at 748. In *Gulf Oil*, however, we concluded that the deletion of that language did not signify any Congressional desire to render prohibition of lien clauses completely ineffectual and held that actual knowledge could still bar a maritime lien. *See id.* at 749.

[5]Section 31341 provides in pertinent part:
(a) The following persons are presumed to have authority to procure necessaries for a vessel:
  (1) the owner;
  (2) the master;
  (3) a person entrusted with the management of the vessel
  at the port of supply; or

*Silver Star Enters., Inc. v. SARAMACCA MV*, 82 F.3d 666, 668 n.2 (5th Cir. 1996). The most significant change was that Congress included a definition for "necessaries." *See* 46 U.S.C. § 31301(4). Section 31301(4) states that "'necessaries' includes repairs, supplies, towage, and the use of a dry dock or marine railway." In the prior version of the FMLA, "necessaries" was not defined, but its meaning could be derived from the context of § 971, which stated that a maritime lien could be received for furnishing "repairs, supplies, towage, use of dry dock or marine railway, or other necessaries." Although § 31301(4) enumerates specific kinds of "necessaries," Congress did not intend to make any substantive change to the law. *See* H.R. Rep. No. 100-918 (1988). Indeed, besides some other minor changes in language, such as replacing the term "furnishing" with the word "providing," little changed substantively. *See*, *e.g.*, **Silver Star**, 82 F.3d at 668 n.2; H.R. Rep. No. 100-98. Accordingly, much of the case law remains persuasive, if not controlling.

---

    (4) an officer or agent appointed by–
       (A) the owner;
       (B) a charterer;
       (C) an owner pro hac vice; or
       (D) an agreed buyer in possession of the vessel.
  Section 31342 reads in pertinent part:
  (a) . . . [A] person providing necessaries to a vessel on the
  order of the owner or a person authorized by the owner
       (1) has a maritime lien on the vessel;
       (2) may bring a civil action in rem to enforce the lien;
       and
       (3) is not required to allege or prove in the action that
       credit was given to the vessel.

10

With that history in mind, we now review each of the claimed maritime liens.

A.    Racal v. TMI

In appealing the district court's judgment finding a maritime lien in favor of Racal over the four vessels used during the Second Charter, TMI raises several arguments to support reversal.  Because TMI most adamantly contends that Racal does not have a lien over the vessels because Racal did not rely on the credit of the vessels, we address that argument first.

Subsection 31342(a)(3) provides that a person providing necessaries to a vessel "is not required to allege or prove . . . that credit was given to the vessel."  The prior version of the FMLA contained a similarly worded statement at § 971.  In construing that prior version, the Supreme Court held that the relevant language only served to remove from the supplier the burden of proving that it relied on the credit of the vessel.  *See* *Equilease*, 793 F.2d at 605 (interpreting *Piedmont*).  That is, we must presume that the supplier relied on the credit of the vessel.

The FMLA may have created a presumption of credit based on the vessel, but it did not do away with "the idea of credit to the vessel being a prerequisite to a lien, and the concomitant principle that credit to the owner negates the lien."  *Id.* Because under the FMLA a presumption arises that one providing supplies to a vessel acquires a maritime lien, the party attacking the

11

presumption must establish that the personal credit of the owner or the charterer was solely relied upon. *Id.* "To meet this burden, evidence must be produced that would permit the inference that the supplier purposefully intended to forego the lien." *Id.*

TMI argues that it satisfied that burden and complied with Fifth Circuit case law, as stated in *Equilease*. For support, it points to testimony by Richard Pender, Racal's president:

Q: So you weren't relying on credit of Tidewater or any of its vessels when you were entering into this contract with Coastline?

. . .

A: Yeah, I mean, our contract was with Coastline. That was our customer.

. . .

Q: At the time of contracting with Coastline, you weren't looking to Tidewater or any of its vessels for payment of Coastline's contract with NCS?

. . .

A: I had no contract with Tidewater.

Q: You had no dealings with Tidewater whatsoever?

A: No. I had no – no.

Racal counters that Pender's testimony does not aid TMI's position that Racal intended to forego a maritime lien because the testimony does not specifically indicate that Racal planned to waive the lien and rely solely on the credit of a party other than the vessel. According to Racal, *Equilease* and the cases preceding it held that a party opposing the maritime lien has the burden to

prove that the supplier looked solely to a party's personal credit. *See* *Equilease*, 793 F.2d at 606; *see also* *Point Landing, Inc. v. Alabama Dry Dock & Shipbuilding Co.*, 261 F.2d 861, 867 (5th Cir. 1958); *Sasportes v. M/V SOL DE COPACABANA*, 581 F.2d 1204, 1209 (5th Cir. 1978) (quoting *Point Landing*). Because Pender's testimony does not state that Racal looked solely to Coastline or some entity other than the vessels, Racal contends that TMI has failed to rebut the presumption.

In *Equilease*, a financing corporation instituted foreclosure proceedings on the preferred mortgages of three chartered vessels. *Equilease*, 793 F.2d at 600. The charterer's insurance broker intervened in the proceedings, attempting to recover for the vessels' unpaid insurance premiums. *Id.* Among other things, the insurance broker claimed a maritime lien under the FMLA for the insurance. *Id.* The financing corporation charged that insurance did not constitute a necessary for purposes of the FMLA. *Id.* Sitting en banc, we held that insurance constituted a necessary but that the insurance broker failed to meet the statutory requirement of reliance on the credit of the vessel when furnishing the insurance. *Id.* at 607.

In determining that the insurance broker did not rely on the credit of the vessel, we specifically noted two items from the record. First, it referred to the testimony of a former manager of the insurance broker. That testimony revealed that the insurance

13

broker looked solely to the charterer, the financing corporation, or another party other than the vessels.

> Q:   So you are saying you relied only on Dunnamis, Equilease, and/or Eltra, is that a fair statement?
>
> A:   That's a fair statement.

*Id.* at 606. Second, we found a statement in the insurance broker's initial appellate brief admitting to sole reliance on a party other than the vessels. In that brief, the insurance broker stated, "The Unilease Companies were totally funded for the operations of the Vessels by Equilease and it was the credit of Equilease upon which all parties placed total reliance." *Id.*

In light of the fact that the insurance broker appeared to rely solely on the credit of entities other than the vessels, the judgment in *Equilease* was in keeping with prior Fifth Circuit case law. But we also concluded in *Equilease* that "in the absence of reliance-intention, by presumption, or otherwise-there is no right to claim a lien." *Equilease*, 793 F.2d at 606 n.9. Thus, we held that by deliberately choosing not to rely on the credit of a vessel, a supplier, as a matter of law, purposefully intends to forego its right to claim a maritime lien. *Id.*

Here, TMI does not point to any evidence directly indicating that Racal intended solely to look towards Coastline or some party other than the vessels for payment, although some items in the

14

record do suggest such a posture.[6]  But Pender's testimony clearly indicates that Racal did not rely on the credit of the vessels. Almost nothing is more conclusive than such testimony as to whether there was reliance.  Not even testimony that Racal looked solely to another party for payment better demonstrates that Racal did not provide the supplies on the credit of the vessels.  When evidence reveals that a supplier looked solely to a party other than a vessel for payment, we are persuaded that the supplier was not relying on the credit of the vessels because of the logical inference that can be derived from that evidence.  In the instant case, we need not trouble ourselves with any inference as the evidence is directly on point.  Accordingly, consistent with *Equilease*, because the testimony explicitly shows that Racal deliberately chose not to rely on the credit of the four chartered vessels, as a matter of law, Racal purposefully intended to forego its maritime lien.[7]  *See **id.***

---

[6]For example, Racal forwarded a promissory note to Coastline to finance the purchase of a computer system.  In addition, Racal's lease proposal to Coastline states that Racal would submit itemized bills to Coastline and that Coastline had to make payment within 30 days.  Of course, neither piece of evidence is sufficient to demonstrate that Racal solely relied on Coastline's credit.  *See **Point Landing***, 261 F.2d at 867.

[7]The two other cases cited by Racal in its brief, ***Point Landing*** and ***Sasportes***, do not sway our view.  First, given any conflict between those two cases and ***Equilease***, the latter controls as an en banc decision.  Second, in neither ***Point Landing*** or ***Sasportes*** was there direct evidence indicating that the supplier did not rely upon the credit of the vessel.  Rather, in both cases, the sole reliance element was emphasized to demonstrate the lack of evidence

But even if Racal had relied upon the credit of the vessels, TMI insists that a maritime lien could not have attached because the equipment and services, which allegedly were necessaries, were not provided to the vessels. Under § 31342, a supplier of necessaries must provide those goods or services to a vessel to receive a maritime lien. Likewise, under § 31342's predecessor statute, a supplier had to furnish necessaries to a vessel to receive the benefits of a lien. *See* 46 U.S.C. § 971 (superseded 1988). As previously noted, the change in terms did not materially alter the law, and we have continued to rely on case law preceding the recodification to interpret the current statute. *See*, *e.g.*, *Silver Star*, 82 F.3d at 668-69.

The seminal case in this area is the Supreme Court's decision in *Piedmont & George's Creek Coal Co. v. Seaboard Fisheries Co,* 41 S. Ct. 1 (1920). In that case, a coal company sought a maritime lien on several vessels that had utilized the coal company's coal. *See* *Piedmont*, 41 S. Ct. at 2. Under the arrangement between the

---

supporting the view that the supplier had not relied on the credit of the vessel. If a supplier solely relied on the credit of a party other than the vessel, then the only logical inference would be that the supplier did not rely on the credit of the vessel. But acceptance of a mortgage or a promissory note by the supplier, as was the case in *Point Landing*, does not inexorably lead to the conclusion that the supplier relied solely on the credit of a party other than the vessel or that the supplier did not rely on the credit of the vessel. *See Point Landing*, 261 F.2d at 867. In the present case, we do not just have evidence of a mortgage or a promissory note, but specific testimony that Racal did not rely upon the credit of the vessels.

16

coal company and the vessels' prior owner, the coal company agreed to furnish such coal as would be required to operate the vessels and the factories of the vessels' prior owner. *Id.* No coal was delivered directly to the vessels, and there was no reference on any invoice to the vessels. *Id.* at 2. Instead, the coal was loaded onto barges, towed to the factories, and then placed in bins to commingle with coal from sources other than the coal company. *Id.* Partly due to those facts, the Supreme Court concluded that the coal company had not furnished the coal to the vessels and that the vessels' prior owner had actually furnished the coal. *Id.* at 4.

Relying on *Piedmont* and other circuit's interpretations of § 31342, we recently declined to extend coverage of the FMLA to bulk cargo containers leased to vessel owners or charterers. *See Silver Star*, 82 F.3d at 667. In *Silver Star*, a cargo container company provided nearly 120 cargo containers to a shipper that owned and/or chartered several vessels. *Id*. When a preferred mortgagee sought to enforce its mortgages against two of the shipper's vessels, the cargo container company intervened, claiming maritime lien rights arising from the lease of the containers. *Id*. We found no such rights because the cargo container company provided the containers to the shipper, not to the vessels. *Id.* at 669. The lease did not earmark particular containers for service on particular vessels. *Id.* at 667. The shipper had ultimate authority as to which vessels

17

the containers were going to be placed. *Id.* at 669. And neither the shipper or the cargo container company knew aboard which ship a particular container would be placed at any given time. *Id.*

Despite *Piedmont* and *Silver Star*'s misgivings about the extension of maritime liens to situations where necessaries were not apparently designated for specific vessels, the district court ruled that Racal had provided necessaries to the four chartered vessels. In so holding, the district court cited as support another Supreme Court case, *Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co.,* 60 S. Ct. 937 (1940). There, an oil company contracted with a shipping company to sell fuel oil to the "vessels owned, chartered, or operated by W.L. Comyn & Sons." *Id.* at 938. Later, two vessels were chartered to W.L. Comyn & Sons, and the oil company supplied them with fuel oil. *Id*. Ultimately, the oil company libeled the two vessels for fuel oil supplied to the vessels on the charterer's orders. *Id*. at 939. In acknowledging that a maritime lien could be asserted against the vessels, the Supreme Court referred to *Piedmont* and noted that "the oil was supplied exclusively for the vessels in question, was delivered directly to the vessels and was so invoiced." *Id.* at 942. Comparing that statement with the facts in the instant case, the district court found that Racal delivered the seismic equipment directly to the vessels.

We believe that was error. Although the *Dampskibsselskabet*

18

court stated that "the oil was supplied exclusively for the vessels in question, was delivered directly to the vessels and was so invoiced" in response to the vessels' owners' contention that *Piedmont* precluded a maritime lien from attaching, the owners did not raise the *Piedmont* case to contest whether the oil company had furnished the oil to the vessels. Rather, the owners pressed *Piedmont* because that case, like theirs, involved a general contract to supply a necessary, and they thought that *Piedmont* somehow affected the issue of whether the oil company had supplied oil upon the charterer's credit and not upon the credit of the vessels. That is, the holding of *Dampskibsselskabet* did not actually pertain to whether the oil company had provided fuel oil to the vessels.

Assuming, though, that the *Dampskibsselskabet* court's statement was not dicta, we still conclude that the district court erred in finding that Racal provided the seismic equipment and services to the vessels.[8] Contrary to *Dampskibsselskabet*, Racal did not supply the equipment and services exclusively for the four Second Charter vessels. Indeed, Racal and Coastline entered into several agreements with respect to the services and the leased and sold equipment months before the Second Charter vessels were ever

_____

[8]The district court also found as important the fact that the seismic equipment was installed at a shipyard that is a subsidiary of TMI's mother corporation. We do not find that fact to be determinative in reaching our conclusion.

19

selected. Racal cannot fairly say that the alleged necessaries were exclusively provided to the Second Charter vessels when the equipment, and the attendant services, was first procured to be placed in unnamed vessels that were later designated as the First Charter vessels. The equipment was sold or leased to Coastline, which had control over which vessels the equipment was to be placed. Subsequent to the Gulf of Mexico operation, Coastline merely transferred the equipment, and the attendant services, to the Second Charter vessels. Accordingly, we believe that the instant case more closely parallels the situations confronted in *Piedmont* and *Silver Star* and conclude that Racal's equipment and services were not provided to the vessels.

Because Racal did not provide the equipment and services, which constituted the alleged necessaries, to the vessels and because Racal deliberately chose not to rely on the credit of the four chartered vessels, we find that the district court erred in granting Racal's summary judgment motion claiming a maritime lien in TMI's Second Charter vessels.[9] Therefore, we reverse and remand for proceedings consistent with this opinion.

B. TMI v. Input

TMI's other issue on appeal concerns the district court's ruling denying TMI a maritime lien over Coastline's equipment

---

[9]TMI raised two other arguments in support of reversal. In light of our holding, we need not address those arguments.

despite Coastline's breach of the charter for non-payment.  The district court orally held that Coastline's equipment was not cargo and declined to extend the concept of a maritime lien to items other than cargo.  In challenging the district court's decision, TMI contends that a general maritime lien may be asserted for breach of a charter and that, in any case, Coastline's equipment was cargo.

Maritime liens are stricti juris and will not be extended by construction, analogy, or inference.  *Piedmont*, 41 S. Ct. at 4.  Moreover, they are largely statutorily created.  *See **Lake Charles Stevedores, Inc. v. PROFESSOR VLADIMIR POPOV MV***, 199 F.3d 220, 224 (5th Cir. 1999), *cert. denied*, 120 S. Ct. 2006 (2000).  Thus, to determine the validity of a maritime lien, we must normally refer to statutory law or those liens that have been historically recognized in maritime law.  *Id.*

Here, TMI's claimed maritime lien clearly does not come within the province of the FMLA.  As for non-statutory maritime law, TMI has been unable to uncover a single case directly on point that suggests that a shipowner may assert a maritime lien against the charterer for items that are not cargo.  The cases cited by TMI are inapposite and actually concern maritime liens in favor of the charterer against the boat owner.  *See **E.A.S.T., Inc. v. M/V ALAIA***, 876 F.2d 1168 (5th Cir. 1989); ***International Marine Towing, Inc. v. Southern Leasing Partners, Ltd.***, 722 F.2d 126 (5th Cir. 1983).  Nor

21

do those cases extend a maritime lien to items other than cargo for breach of a charter. The lack of precedential authority and the stricti juris nature of a maritime lien are damning to TMI's cause, and we conclude that TMI's attempt to extend the concept of a maritime lien is unavailing.

With respect to TMI's other contention that Coastline's equipment was cargo, we find no error on the part of the district court. The evidence clearly indicates that TMI differentiated between cargo and Coastline's equipment. Furthermore, unlike cargo, much of Coastline's equipment had to be installed onto the vessels. Accordingly, we affirm the district court's judgment denying TMI a maritime lien over Coastline's equipment.

## IV. CONCLUSION

For the foregoing reasons, we reverse the district court's judgment granting a maritime lien to Racal and remand for proceedings consistent with this opinion. As for the district court's judgment denying TMI a maritime lien on Coastline's equipment, we affirm.