# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 11, 2026

Lyle W. Cayce
Clerk

No. 25-30331

———————

Trailer Bridge, Incorporated,

*Plaintiff—Appellant/Cross-Appellee*,

*versus*

Louisiana International Marine, L.L.C.,

*Defendant—Appellee/Cross-Appellant*,

*versus*

Atlanta Bridge, *in rem*, together with their engines, tackle, furniture, apparel, appurtenances, etc.; Memphis Bridge, *in rem*, together with their engines, tackle, furniture, apparel, appurtenances, etc.,

*Third Party Defendants—Appellants/Cross-Appellees*.

———————

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:22-CV-5358

———————

Before Jones, Stewart, and Willett, *Circuit Judges*.

By Edith Hollan Jones, Circuit Judge:

Louisiana International Marine ("LIM"), the owner of two tugboats, seeks to recover unpaid invoices for towing a pair of barges along the Gulf of

America coast. The former barge owner objects that the towage services were received only after the barges were chartered to a third party in an agreement that expressly forbade the third party from incurring liens on the barges. Because LIM lacked actual knowledge of the "no-lien" provision at the time it contracted to provide towage services, a maritime lien attached to the barges. The district court's judgment is AFFIRMED.

## Background

In August 2020, Plaintiff Appellant Trailer Bridge, Inc., a freight service company, chartered two oceangoing, flat deck barges, the ATLANTA BRIDGE and the MEMPHIS BRIDGE ("the Barges"), to Work Cat Trans Gulf[1] ("Work Cat"). Trailer Bridge chartered the Barges pursuant to a Standard Barge Charter Party Agreement ("the Barge Charter"). The Barge Charter contained a "no-lien" clause that required Work Cat to "indemnify and hold [Trailer Bridge] harmless against any lien of whatsoever nature arising upon the Barge" during the contract period.

Work Cat needed the Barges to transport containers between Tampa, Florida, and Brownsville, Texas. To that end, Work Cat also chartered two tugboats ("the Tugs"), the LA COMMANDER and the LA INVADER, from LIM to propel the Barges. Work Cat and LIM finalized a six-month charter agreement for the Tugs ("the Tug Charter") in November 2020, commencing in mid-December 2020. The Tug Charter required Work Cat to pay a daily rate for the Tugs, in addition to covering the cost of fuel and lubricant the Tugs required.

On December 11, 2020, Work Cat began using the Tugs to tow the Barges. Work Cat continued using the Tugs until June 18, 2021. Although

---

[1] Work Cat Trans Gulf was renamed to Work Cat Florida in August 2021.

Work Cat paid LIM for the Tugs for about two weeks until December 31, 2020, Work Cat paid less than a quarter of LIM's remaining invoices.

In May 2021, Work Cat filed for bankruptcy. LIM filed a proof of claim in the bankruptcy, seeking to recover its unpaid invoices for towage services and supplies. Trailer Bridge also filed a proof of claim.

Outside of the bankruptcy proceeding, LIM filed two notices of lien claims with the National Vessel Documentation Center, asserting two liens valued at $1,364,214.16 against the Barges. LIM later demanded payment from Trailer Bridge to cover its unpaid towage, fuel, and lubricant invoices. Trailer Bridge refused to pay.

By November 2022, Trailer Bridge had sold the Barges to nonparties. LIM sent a Notice of Lien and Demand for Payment to one of the purchasers of the Barges. Pursuant to its purchase agreement with the new barge owners, Trailer Bridge stepped in to defend the lawsuit and indemnify the purchasers against LIM's claims.[2] Trailer Bridge filed a lawsuit seeking a declaration that the Barges were not subject to LIM's maritime lien. Relevant here, Trailer Bridge argued that no lien had attached to the Barges because the Barge Charter contained a no-lien provision and that LIM had relied exclusively on the credit of Work Cat, not the Barges. Trailer Bridge also sought to recover attorney's fees under 46 U.S.C. § 31343(c)(2), a part of the Commercial Instruments and Maritime Liens Act (CIMLA). LIM counterclaimed for attorney's fees against Trailer Bridge *in personam*. In addition, LIM filed a Third-Party Claim against the Barges, *in rem*, seeking

---

[2] LIM and Trailer Bridge entered a lien escrow agreement that transferred LIM's liens to cash held in escrow so that Trailer Bridge could finalize the sale of the Barges free and clear of any liens. That lien escrow agreement permits LIM to look to the lien escrow funds and Trailer Bridge to satisfy its claims.

$1,556,414.16 for unpaid towage services and $361,381.56 for fuel and lubricant costs.

After a two-day bench trial, the district court concluded that LIM had a lien against the MEMPHIS BRIDGE for $863,162.50 and against the ATLANTA BRIDGE for $630,420.10. In its initial judgment, the district court awarded LIM attorney's fees, but it did not include Trailer Bridge as a party to the judgment. LIM moved to obtain $186,717.50 in attorney's fees and to add Trailer Bridge as a party to the judgment so that it could recover attorney's fees *in personam*. After reviewing both motions, the district court changed its mind and refused to award attorney's fees to either party.

Trailer Bridge appealed on behalf of the Barges. LIM cross appealed.

## Discussion

On appeal, Trailer Bridge contends that LIM has no maritime liens on the Barges, but it alternatively disputes the value and scope of those liens. LIM cross-appeals for attorney's fees.

A. LIM's Maritime Lien

The parties first dispute whether LIM has any maritime lien on the Barges at all. "Whether a maritime lien exists is a question of law, reviewed *de novo*." *Martin Energy Servs., L.L.C. v. Bourbon Petrel M/V*, 962 F.3d 827, 830 (5th Cir. 2020) (quoting *Comar Marine, Corp. v. Raider Marine Logistics, LLC*, 792 F.3d 564, 575 (5th Cir. 2015)). Underlying findings of fact are reviewed for clear error. *See Comar*, 792 F.3d at 575. A factual finding is "clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Guzman v. Hacienda Recs. & Recording Studio, Inc.*, 808 F.3d 1031, 1036 (5th Cir. 2015) (quoting

*Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S. Ct. 1504, 1511 (1985)).

Under CIMLA, a party may obtain a maritime lien if it (a) provides necessaries (b) to a vessel (c) on the order of the owner, or a person authorized by the owner. *ING Bank N.V. v. Bomin Bunker Oil Corp.*, 953 F.3d 390, 393–94 (5th Cir. 2020); *see also* 46 U.S.C. § 31342(a). "Necessaries" include "repairs, supplies, towage, and the use of a dry dock or marine railway." 46 U.S.C. § 31301(4); *see also Equilease Corp. v. M/V Sampson*, 793 F.2d 598, 603 (5th Cir. 1986) (explaining that "necessaries" include "the things that a prudent owner would provide to enable a ship to perform well the functions for which she has been engaged"). Officers or agents appointed by a charterer "are presumed to have authority to procure necessaries for a vessel." 46 U.S.C. § 31341(a), (a)(4).

LIM fulfilled CIMLA's three requirements to attach a maritime lien on the Barges. By using the Tugs to provide towage services to the Barges, LIM provided a type of necessary explicitly enumerated in CIMLA. *See* 46 U.S.C. § 31301(4). It provided those necessaries to a vessel. *See* 1 U.S.C. § 3 ("The word 'vessel' includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water."); *see also Norton v. Warner Co.*, 321 U.S. 565, 571, 64 S. Ct. 747, 751 (1944) (extending the definition of "vessel" in 1 U.S.C. § 3 to barges because they are "means of transportation on water"). And, because Work Cat chartered the Barges, its agents were presumed to have authority to procure necessaries for the Barges under 46 U.S.C. § 31341(a)(4)(B). Work Cat's agents did just that when they entered into the Tug Charter with LIM. Accordingly, the towage services were obtained by "a person authorized by the owner" of the Barges to obtain necessaries. 46 U.S.C. § 31342(a).

Trailer Bridge raises numerous countervailing arguments. To begin, Trailer Bridge asserts that LIM relied exclusively on the credit of Work Cat when it provided towage services, rather than on the credit of the Barges. Where a party does not rely on the credit of the vessel on which a lien is claimed, no lien is formed. *See Equilease*, 793 F.2d at 605–06; *see also Racal Surv. U.S.A., Inc. v. M/V Count Fleet*, 231 F.3d 183, 189 (5th Cir. 2000) (explaining that the statutory presumption in favor of the creation of maritime liens did not eliminate "the idea of credit to the vessel being a prerequisite to a lien" (quoting *Equilease*, 793 F.2d at 605)). "Because of the strong presumption in favor of a maritime lien," however, Trailer Bridge must demonstrate that LIM "deliberately intended to look solely to the owner's personal credit and to forego the valuable privilege afforded it by law." *Equilease*, 793 F.2d at 606.

To establish that LIM looked solely to Work Cat's personal credit, Trailer Bridge points to two pieces of evidence. It asserts that LIM invoiced Work Cat for the cost of towage, not the Barges or Trailer Bridge. But "invoicing the charterer . . . [is] inadequate to show that a creditor relied solely on such charterer." *Maritrend, Inc. v. Serac & Co. (Shipping)*, 348 F.3d 469, 474–75 (5th Cir. 2003). "[I]nvoicing only the charterer . . . only shows that a party attempted to receive the payment from the charterer first, not that it never intended to rely on the credit of the vessel." *Id.* at 475. *Maritrend* directly rebuts Trailer Bridge's argument.

More significantly, Trailer Bridge relies on the deposition of LIM's corporate representative, Anthony Roberts, who stated that he did not work for the Barges or extend them credit. In focusing on Roberts's deposition, Trailer Bridge ignores his subsequent trial testimony, in which he clarified that LIM did not view Work Cat "as the sole source" of payment for the invoices because LIM "had the opportunity, if [it] didn't get paid, to lien the cargo, the equipment, [and] the barge." Roberts's isolated deposition

statement, later clarified at trial, is insufficient to rebut the presumption that a maritime lien formed here.

Next, Trailer Bridge contends that even if LIM satisfied CIMLA's maritime lien prerequisites, the Barge Charter's "no-lien" provision prevented LIM from obtaining a lien. In relevant part, the provision states:

> The Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the Owners in the Barge. (a) The Charterers shall indemnify and hold the Owners harmless against any lien of whatsoever nature arising upon the Barge during the Charter Party period while she is under the control of the Charterers and on any claims against the Owners arising out of or in relation to the operation of the Barge by the Charterers.

If applicable, the no-lien provision would bar the formation of LIM's maritime lien.

"A no-lien clause does not prevent a maritime lien from arising unless the entity providing necessaries had actual knowledge of the clause." *John Bludworth Shipyard, L.L.C. v. Bechtolt*, 138 F.4th 372, 376 n.1 (5th Cir. 2025) (quoting *Lake Charles Stevedores, Inc. v. Professor Vladimir Popov MV*, 199 F.3d 220, 225 (5th Cir. 1999)). Proving actual knowledge typically entails showing "an affirmative communication by the Vessel or her Owner to one of the supplier's employees who has the ability to effect the negotiations and the contract **prior** to the time the contract is entered into." *ING Bank, N.V. v. M/V Charana Naree*, 446 F. Supp. 3d 163, 172 (W.D. La. 2020) (emphasis in original) (quoting *O.W. Bunker Malta Ltd. v. M/V TROGIR*, 2013 WL 326993, at \*3 (C.D. Cal. Jan. 29, 2013)); *see also TTT Stevedores of Texas, Inc. v. M/V Jagat Vijeta*, 696 F.2d 1135, 1138 (5th Cir. 1983) (finding that a party lacked adequate notice of a no-lien provision when the provision had not been disclosed "at the time [the party] entered into the contract to provide stevedoring services").

According to Trailer Bridge, LIM gained actual knowledge of the no-lien provision from an email Roberts received on December 20, 2020. The email contained a copy of the Barge Charter in which the no-lien provision appears. LIM responds that Roberts received the Barge Charter in answer to an unrelated inquiry. Roberts only reviewed the charter to resolve that inquiry, and he claims he never consulted the part of the charter that contained the no-lien provision.

LIM undeniably had actual knowledge of the no-lien provision as of December 20, 2020. The "law simply cannot allow a supplier to deny knowledge of a no lien clause when it was delivered in a manner that was both customary and reliable in the shipping business." *Stevens Shipping & Terminal Co. v. Japan Rainbow, II MV*, 334 F.3d 439, 444 (5th Cir. 2003). LIM does not appear to dispute that email is both a customary and reliable manner of delivering documents. Because LIM received the Barge Charter in a reliable and customary manner, it cannot claim ignorance merely by denying that its agent read the relevant portion of the agreement.

Unfortunately for Trailer Bridge, however, the Tug Charter had already been finalized by December 20, 2020. Work Cat and LIM executed the Tug Charter on November 12, 2020. Performance began a month later, on December 11. Under *TTT Stevedores of Texas*, actual knowledge of a no-lien provision must precede the completion of an agreement. 696 F.2d at 1138. Here, LIM had already entered a six-month charter with Work Cat by the time it received the Barge Charter and learned of that document's no-lien provision. That was too late for the provision to have any bearing on its negotiations or decision-making. Accordingly, LIM lacked actual knowledge of the no-lien provision at the relevant time, before it agreed on the Tug Charter.

Trailer Bridge makes two further arguments to shore up the no-lien provision's effectiveness. Trailer Bridge begins by suggesting that LIM had an independent duty to investigate whether any no-lien provision applied to the Barges. If this case had arisen under the statute that preceded CIMLA, Trailer Bridge would certainly have been correct. That statute, the Federal Maritime Lien Act (FMLA), imposed a duty of reasonable diligence on suppliers of necessaries. *See* Act of June 5, 1920, ch. 250, § 30(R), 41 Stat. 1005 (1920) ("[N]othing in this section shall be construed to confer a lien when the furnisher knew, or by exercise of reasonable diligence could have ascertained, that because of the terms of a charter party . . . the person ordering the . . . necessaries was without authority to bind the vessel therefor."); *see also Gulf Oil Trading Co., a Div. of Gulf Oil Co. v. M/V CARIBE MAR*, 757 F.2d 743, 747 (5th Cir. 1985). In 1971, Congress amended the law, removing the reference to an "exercise of reasonable diligence." *See Racal*, 231 F.3d at 188. Because courts generally "refuse to interpret [a statute] in a way that negates its recent revision," Congress's removal of the reasonable diligence requirement is strong evidence that the requirement no longer exists. *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 57–58, 126 S. Ct. 1297, 1306 (2006).

Undeterred, Trailer Bridge points to a decision in which this court suggested that the 1971 amendments eliminated the reasonable diligence requirement only for materialmen. *See Cardinal Shipping Corp. v. M/S Seisho Maru*, 744 F.2d 461, 470 (5th Cir. 1984) ("The [1971] amendment certainly affected the power of the *materialman* to acquire a maritime lien . . . but it had no effect on other contractors. . . . [I]t has never purported to govern the shipper's or subcharterer's lien." (emphasis in original)). Proffering a narrow definition of materialman that includes only "shoreside business[es] that suppl[y] goods and repairs to vessels usually holding a maritime lien for services and goods," Trailer Bridge argues that LIM is not a materialman and

thus retains a duty of reasonable investigation. NICHOLAS J. HEALY, ET. AL, CASES AND MATERIAL ON ADMIRALTY 919 (Thomson Reuters, 5th ed. 2012).

A closer examination of the *Cardinal* court's reasoning reveals that it encompasses more maritime suppliers than Trailer Bridge's narrow definition. The court in *Cardinal* reasoned from the premise that "[t]he Maritime Lien Act delineated the rights only of materialmen." *Cardinal*, 744 F.2d at 470. The original and amended versions of the act applied to "[a]ny person furnishing repairs, supplies, *towage*, use of dry dock or marine railway, or other necessaries, to any vessel . . . ." 46 U.S.C. § 971 (1976) (emphasis added), *amended by*, 46 U.S.C. § 31342. Based on this provision, if the *Cardinal* court understood materialmen in the sense advocated by Trailer Bridge, it would have contradicted the statute's unambiguous reference to towage services. But *Cardinal* did not misinterpret CIMLA; the court used "materialmen" in a generic sense to mean all suppliers covered by CIMLA. Treatises on admiralty law confirm that parties providing the services enumerated in the act no longer have a duty of reasonable inquiry. THOMAS J. SCHOENBAUM, 1 ADMIRALTY & MAR. LAW § 9:3 (7th ed. 2026) ("The 1971 amendment negates the duty of reasonable inquiry only with respect to materialmen and *suppliers covered by the Federal Maritime Lien Act*." (emphasis added)). LIM, as a provider of towage services, is covered by CIMLA and therefore benefits from the statute's elimination of the reasonable diligence requirement.[3]

Trying a different angle, Trailer Bridge contends that the no-lien provision contained in the Barge Charter makes it impossible for LIM to

---

[3] Our holding does not displace *Cardinal*'s conclusion that the duty of reasonable diligence persists for suppliers, shippers, and charterers who provide services or enter contracts that are not covered by CIMLA.

satisfy the third prong of 46 U.S.C. § 31342(a), that the necessaries be obtained by a person authorized to do so. The no-lien provision, the argument goes, rendered Work Cat's agents incapable of incurring liens on the Barges. Thus, Work Cat's agents were not "authorized by the owner" to procure towage services. Trailer Bridge's position cannot be reconciled with the statute or this court's cases. The statute requires only that the person who obtained necessaries be authorized to obtain the necessaries, not that the person be authorized to incur a lien. The statutory presumption in 46 U.S.C. § 31341(a)(4) renders Work Cat's agents capable of obtaining necessaries. Moreover, Trailer Bridge's reading would render the "actual knowledge" requirement established in this court's case law irrelevant. If a no-lien provision barred the formation of liens under § 31342(a) regardless of knowledge, then there would be no reason to inquire whether a party had actual knowledge of the provision. Trailer Bridge's stance would vitiate decades of this court's precedents applying the actual knowledge requirement.

With the existence of LIM's maritime lien confirmed, we must still determine its value. Trailer Bridge suggests that LIM's invoices are too nonspecific to appropriately quantify the value of its lien. LIM, on the other hand, suggests the district court erred by excluding fuel and lubricant costs from its award of damages. Both parties are incorrect. The district court appropriately calculated the value of towage services LIM provided to the Barges, and that amount properly excluded the cost of fuel and lubricants.

A maritime lien is based on the cost of the necessaries provided. Here, the Tugs were attached to the Barges around the clock. Some of that time was spent towing the Barges. But some of that time was also spent idling, including the "standby time" when the Barges were being loaded or unloaded in port. Trailer Bridge contends that LIM's lien can only include the time spent under towage, not standby time. Because LIM's invoices do

not distinguish between towing and standby time, Trailer Bridge challenges the district court's conclusion that the invoices reflect the correct amount of LIM's lien.

This court's holding in *Trico Marine Operators, Inc. v. Falcon Drilling Co.*, 116 F.3d 159 (5th Cir. 1997), refutes Trailer Bridge's argument. There, this court approved the district court's decision that "transit and standby time . . . [are] also lienable." *Trico Marine Operations, Inc. v. Falcon Drilling Co.*, No. CIV. A. 95-0381, 1996 WL 96883, at *6 (E.D. La. Mar. 1, 1996). Trailer Bridge attempts to distinguish *Trico* by arguing that the contract in *Trico* expressly contemplated standby time. By structuring the Tug Charters to depend on day rates, however, Work Cat and LIM necessarily included standby time in the scope of their contract. LIM's invoices prove the amount of the lien.

Dissatisfied with merely recovering the cost of its towage services, LIM also seeks to recover the costs of fuel and lubricant used while the Tugs were servicing the Barges. The district court denied this request, reasoning that these supplies were necessaries provided to the Tugs, not to the Barges. LIM challenges this reasoning, as it characterizes the fuel and lubricants as "an element of the reasonable value of towage services provided to the Barges." LIM also points out that the costs of fuel and lubricant were included in the Tug Charter.

The district court properly excluded fuel and lubricant costs in its calculation of LIM's maritime lien. CIMLA's provisions are applied *stricti juris* and are not "lightly extended by construction, analogy, or inference." *Valero Mktg. & Supply Co. v. M/V Almi Sun, IMO No. 9579535*, 893 F.3d 290, 292 (5th Cir. 2018) (quoting *Atl. & Gulf Stevedores, Inc. v. M/V Grand Loyalty*, 608 F.2d 197, 200–01 (5th Cir. 1979)). Far from narrowly construing necessaries, LIM's position lacks any limiting principle. If consumable costs

for the Tugs constitute necessaries provided to the Barges, then labor or repair costs for tugboats might also qualify. By opening the door to these possibilities, LIM's position runs afoul of this court's practice of strictly limiting necessaries. Moreover, that the contract provided for fuel and lubricant costs separately from the day rate for towage services emphasizes that these costs were different. Because the cost of consumables provided to the Tugs is distinct from the value of the services provided to the Barges, the district court's calculation of LIM's maritime lien was correct.

B. Attorney's Fees

The district court initially awarded attorney's fees *in rem* to LIM as the prevailing party in Trailer Bridge's suit. When LIM moved to have the fees awarded *in personam* against Trailer Bridge instead, the district court ordered each party to bear its own legal costs. The court explained that LIM "provide[d] no authority, nor can the Court locate any, wherein attorney's fees and costs were awarded *in personam* when the underlying prevailing claim was *in rem*." LIM disagrees and asserts that the joinder of *in rem* claims to an *in personam* action does not undermine an award of attorney's fees.

Courts of appeals review a district court's award of attorney's fees under 46 U.S.C. § 31343(c)(2) for an abuse of discretion. *See, e.g.*, *Whalen v. M/V Miluska*, 385 Fed. Appx. 717, 719 (9th Cir. 2010).

In "a civil action in Admiralty to declare that a vessel is not subject to a lien," a district "court may award costs and attorneys fees to the prevailing party, unless the court finds that the position of the other party was substantially justified or other circumstances make an award of costs and attorneys fees unjust." 46 U.S.C. § 31343(c)(2). It is undisputed that when a court awards such attorney's fees, they must be awarded *in personam*. This is because attorney's fees are not necessaries, and they thus cannot be part of the value of a maritime lien. *See Gulf Marine & Indus. Supplies v. Golden Prince*

*M/V*, 230 F.3d 178, 180 (5th Cir. 2000) ("Since Congress enacted the FMLA, courts have consistently held that legal services are not necessaries."); *Bradford Marine, Inc. v. M/V Sea Falcon*, 64 F.3d 585, 588–89 (11th Cir. 1995) ("A suit *in rem* to enforce a maritime lien is limited to the value of the lien itself.").

LIM prevailed in Trailer Bridge's suit to declare that the Barges were not subject to a lien. This is a precondition for a fee award under 46 U.S.C. § 31343(c)(2). In addition, contrary to Trailer Bridge's contention, the district court dismissed Trailer Bridge as a party for only the non-attorney's fees claims. As a result, an *in personam* recovery of fees from Trailer Bridge seems possible if Trailer Bridge had become a party to the judgment.

Nevertheless, the district court did not abuse its discretion in rejecting LIM's request. The statute gives courts discretion to award attorney's fees. *See* 46 U.S.C. § 31343(c)(2) ("The court *may* award costs and attorneys fees." (emphasis added)). Although the statute lists two circumstances in which a court may *not* award fees, it specifies no circumstances in which a court is *required* to award fees. Given that unconstrained discretion, the district court was justified in finding that the unique posture of this litigation made it equitable for each party to bear its own costs. Ordinarily, plaintiffs who bring an *in rem* action against a vessel may also pursue an "*in personam* action against any party that is directly liable in contract, tort, or some other substantive law." *Dowell Div. of the Dow Chem. Co. v. Franconia Sea Transp., Ltd.*, 504 F. Supp. 579, 581 (S.D.N.Y. 1980), *aff'd sub nom. Dowell Div. of Dow Chem. v. Franconia Sea Transp. Ltd.*, 659 F.2d 1058 (2d Cir. 1981). But if there is no "separate basis of substantive liability," the *in personam* defendant is generally not "liable to the plaintiff merely because a maritime lien has come into existence." *Id.* Because there is no separate basis for Trailer Bridge's liability to LIM, the district court concluded that it was equitable for each party to bear its own costs. The district court's adherence to the

traditional understanding of *in personam* recoveries is not an abuse of discretion. Accordingly, LIM's claim for attorney's fees fails.

## C. Alternative Grounds for Reversal

Trailer Bridge urges reversal on two other grounds, but neither is persuasive. First, Trailer Bridge argues that LIM's claims were discharged in the Work Cat bankruptcy proceedings. The bankruptcy court approved a settlement and compromise between LIM and the bankruptcy trustee for some of LIM's unpaid invoices. But the "discharge of a debt of the debtor does not affect the liability of any other entity on . . . such debt." 11 U.S.C. § 524(e). The discharge of Work Cat's debts did not discharge the debts of Trailer Bridge or the Barges.[4] Instead, the amount LIM recovered in the bankruptcy, $86,280, merely reduced the amount it can recover here, and LIM reduced its demand in this case accordingly.

Second, Trailer Bridge suggests the district court abused its discretion by awarding LIM prejudgment interest from the date of the last unpaid invoice. "As a general rule, prejudgment interest should be awarded in admiralty cases." *Kenai Ironclad Corp. v. CP Marine Servs., LLC*, 84 F.4th 600, 614 (5th Cir. 2023) (quoting *Comar*, 792 F.3d at 580). District courts may decline to award prejudgment interest only where doing so would create an inequitable result. *Id.* Trailer Bridge does not adequately explain why awarding prejudgment interest was inequitable here. It was hardly unreasonable, much less an abuse of discretion, to begin counting interest from the date of the last invoice, when LIM last provided its services to the Barges.

---

[4] Because the compromise in the bankruptcy proceedings involved different parties, *res judicata* also does not foreclose LIM from recovering in this suit.

The judgment of the district court is AFFIRMED.